CITY OF ROCKY RIVER, APPELLANT, *v.* STATE EMPLOYMENT RELATIONS BOARD ET AL., APPELLEES.

[Cite as Rocky River *v.* State Emp. Relations Bd. (1989), 43 Ohio St. 3d 1.]

(No. 87-157—Submitted February 8, 1989—Decided May 10, 1989.)

*Calfee, Halter & Griswold, Mark I. Wallach, William E. Coughlin, John E. Gotherman* and *Russell A. Olson,* law director, for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, and *Loren L. Braverman,* for appellee State Employment Relations Board.

*Joseph W. Diemert, Jr. & Associates Co., L.P.A., Joseph W. Diemert, Jr.* and *William F. Schmitz,* for appellee Rocky River Firefighters Assn., Local 695.

*Berkman, Gordon, Murray & Palda, George W. Palda* and *Lorraine R. Baumgardner,* for appellee AFSCME Ohio Council 8.

*Conway, Barclay, Deyo & Kurant Co., L.P.A.,* and *Donald K. Barclay,* urging reversal for *amicus curiae* Ohio Municipal League.

Douglas, J.

## I

### The Procedure

There have been a number of questions presented in both public and private forums concerning the procedure by which this case is again before us for decision. Considering the concurring statement of Justice Brown and the dissenting statements of Chief Justice Moyer and Justice Holmes in *Rocky III, supra,* we conclude that it would serve no useful purpose for any more to be written concerning motions for rehearing, clarification or reconsideration or to write further concerning time limits, past precedents on such motions or who voted how and when or why on such motions. Suffice it to say that this case has consumed a considerable amount of the time of all the members of this court and the moment has now come to place at rest the issues presented by this case.

## II

### Stare Decisis

Different from the procedural intricacies of this case is the question of *stare decisis.*

"*Stare decisis*" is, of course, shorthand for *stare decisis et non quieta movere* — "stand by the past decisions and do not disturb settled things." See Black's Law Dictionary (5 Ed. Rev. 1979) 1261. The heritage of the law is built like a wall — brick by brick. The spirit of the Anglo-Saxon law is, in part, the impact of the cases as they come down through the years. Each case as it is decided supplies another brick for the wall and gives us the taught tradition of the law. This tends

to provide the stability necessary for an organized society to deal with its everyday affairs.

Uniformity and continuity in law are necessary for us to deal with our daily pursuits. We need to preserve the integrity of contractual agreements, wills, conveyances of property and our dealings in the commercial marketplace. The applications of the principles of tort cannot be an ever-changing concept. What is negligence in the morning must also be negligence in the afternoon. To permit such standards to be in a continual state of flux would invite havoc.

The doctrine of *stare decisis* provides solid rocks upon which men and women can build and arrange their affairs with confidence. The doctrine serves to remove the capricious element from the law and lends stability to society. *Stare decisis* is a strong tie which our future has with our past.

But the doctrine as it is generally applied (and as discussed in the foregoing) concerns the interpreting and deciding of the common law and the construction of statutes, ordinances, rules and regulations. The doctrine does not apply with the same force and effect when constitutional interpretation is at issue.

Accordingly, for at least three reasons, the doctrine of *stare decisis* does *not* apply to the case at bar. Because of the extensive discussion within the court among its members, and the widespread commentary in legal circles and in the press,[7] we find it necessary and appropriate to set forth, in some detail, these reasons.

### A

If *stare decisis* has any efficacy at all in this case, it is that the majority in *Rocky I* should have followed this court's prior holdings in *State, ex rel. Bd. of Trustees of Pension Fund*, v. *Bd. of Trustees of Relief Fund* (1967), 12 Ohio St. 2d 105, 41 O.O. 2d 410, 233 N.E. 2d 135 (hereinafter *"Pension Fund"*); *State, ex rel. Dayton Fraternal Order of Police Lodge No. 44*, v. *State Emp. Relations Bd.* (1986), 22 Ohio St. 3d 1, 22 OBR 1, 488 N.E. 2d 181 (hereinafter *"Dayton F.O.P."*) and *Kettering* v. *State Emp. Relations Bd.* (1986), 26 Ohio St. 3d 50, 26 OBR 42, 496 N.E. 2d 983. These cases long ago settled the home-rule amendment argument pitting Sections 3 and 7, Article XVIII versus Section 34, Article II of the Ohio Constitution, to be discussed in more detail *infra*. Also settled were the questions of whether the collective bargaining law is a law of general nature and whether the Act was enacted pursuant to the police power of the state to promote the general safety and welfare, thereby prevailing over laws of a municipality adopted in the exercise of its powers of local self-government. In these previous cases, both questions were answered in the affirmative.

Therefore, if the doctrine of *stare decisis* applies to *Rocky River*, it should have been followed in *Rocky I.* Not having been followed in *Rocky I,* it cannot apply in *Rocky IV.*

### B

The doctrine of *stare decisis* is a doctrine applying to future cases where the facts of a subsequent case are substantially the same as a former case. Black's Law Dictionary (5 Ed. Rev. 1979) 1261. *Rocky IV* is not a *different* case than *Rocky I.* It is the *same* case! Therefore, the doctrine cannot apply to *Rocky IV.*

---

[7] See, as examples, the editorial of the Cleveland Plain Dealer, Feb. 14, 1989, at 4B, and the editorial of the Dayton Daily News, Feb. 20, 1989, at 10A.

## C

More important than any of the above is the fact that in *Rocky River,* we are dealing with constitutional issues. As will be discussed in detail *infra,* the questions presented to us in this case involve the construction and interpretation of Sections 3 and 7, Article XVIII and Section 34, Article II of the Ohio Constitution. While it is true that *stare decisis* is a rule that judges should observe with some reverence, it is also true that when constitutional issues are at stake, the rule is less compelling. There are several reasons for this.

Justice Brandeis, in one of his now famous and often-quoted writings on the subject, has said that "* * * [s]*tare decisis* is ordinarily a wise rule of action. But it is not a universal, inexorable command. * * *" *Washington* v. *W.C. Dawson & Co.* (1924), 264 U.S. 219, 238 (Brandeis, J., dissenting). In an even more direct reference to constitutional issues, Justice Brandeis stated in *Burnet* v. *Coronado Oil & Gas Co.* (1932), 285 U.S. 393, 406-408 (Brandeis, J., dissenting):

"* * * *Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. * * * This is commonly true even where the error is a matter of serious concern, provided correction can be had by legislation. But in cases involving the Federal Constitution, where correction through legislative action is practically impossible, this Court has often overruled its earlier decisions. The Court bows to the lessons of experience and the force of better reasoning, recognizing that the process of trial and error, so fruitful in the physical sciences, is appropriate also in the judicial function. * * *" (Footnotes and citations omitted.)

Accordingly, courts often assert that the rule of *stare decisis* is applied with varying force depending on the specific type of precedent involved. In the case of common-law precedents, such precedents provide the benchmark by which other case law is measured. When a precedent involves statutory interpretation, such precedent is viewed as more sacrosanct than the common-law precedents.

In contrast, the doctrine of *stare decisis* is less important in the constitutional context than in cases of either pure judge-made law or statutory interpretation. In cases where the legislature has the ability to correct judicial "errors," bad precedents or improperly decided cases need not be cast in concrete. Thus, as justification for their extraordinary reluctance to overturn statute-based precedents, judges often cite the ability of the legislature to correct erroneous interpretations of legislative intent. See, *e.g., Illinois Brick Co.* v. *Illinois* (1977), 431 U.S. 720, 736; *Boys Markets, Inc.* v. *Retail Clerks Union, Local 770* (1970), 398 U.S. 235, 240.

Conversely, it is generally beyond the power of the legislature to change or "correct" judicial interpretation of the Constitution. This is the main justification for taking a more flexible attitude toward overruling precedent in such cases. The doctrine of judicial supremacy in constitutional interpretation is widely and generally conceded. Given the inability of the legislature to override judge-made law in this area, it is clear that when an earlier decision is demonstrably wrong (as in the case of *Rocky I*), it is incumbent on the court to make the necessary changes and yield to the force of better reasoning.

A judge looking at a constitutional decision may have strong feelings to revere the past and accept what was once written. However, each judge remembers above all that she or he has

sworn to support and defend the Constitution — not as someone else has interpreted it but as the judge deciding the case at bar interprets it. Section 7, Article XV of the Ohio Constitution states: "Every person chosen or appointed to any office under this state, before entering upon the discharge of its duties, shall take an oath or affirmation, to support the Constitution of the United States, and of this state, and also an oath of office." R.C. 3.23 provides: "The oath of office of each judge of a court of record shall be to support the constitution of the United States and the constitution of this state * * * according to the best of his ability and understanding. * * *"

Would those who disagree with us in the majority have us violate our sacred oath? Should we, for whatever reason, be denied the right to reexamine constitutional precedent which, after all, is a personal matter for each judge who assumes these responsibilities? If the answer to these questions is "yes," would we not then be letting persons, who may be long dead and gone and unaware of the problems of our age, do our thinking for us? Can we afford to live with such hidebound, slavish adherence to the past when, in fact, we live in an ever-evolving society that requires innovative thinking and even change to cope with problems of the present and future? Just to ask these questions answers them.

We concede we have no greater constitutional authority than those who follow us. But conversely, prior justices had no greater constitutional authority than do we.

What we do today, in reconsider-

ing *Rocky I*, is not some forbidden aberration. It is, in fact, the fulfillment of our constitutional responsibilities, as the United States Supreme Court had done in one hundred seventy-five cases by the end of its 1981 term.[8] One of these cases, of course, is *Plessy* v. *Ferguson* (1896), 163 U.S. 537. In *Plessy,* the Supreme Court had held that "separate but equal" is equal.

The Louisiana statute under review in *Plessy* required railway companies carrying passengers in their coaches in that state to provide "* * * equal but separate accommodations for the white, and colored races, by providing two or more passenger coaches for each passenger train, or by dividing the passenger coaches by a partition so as to secure separate accommodations * * *." *Id.* at 540. The statute provided that no persons shall be permitted to occupy seats in coaches other than the ones assigned to them on account of the race they belong to, and required the officers of the passenger trains to assign each passenger to the coach or compartment assigned for that passenger's race. Fines or imprisonment were imposed upon passengers insisting on going into a coach or compartment other than the one set aside for their race. The statute authorized officers of the trains to exclude any passengers refusing to occupy the coach or compartment assigned to them, and exempted the railway company from liability for such refusal. *Id.* at 540-541.

The court held that neither the Thirteenth nor the Fourteenth Amendment to the United States Constitution bars a state from requiring the separa-

---

[8] See The Constitution of the United States of America: Analysis and Interpretation (1987) 725. According to the 1986 supplement to this source, at 143, the court had issued one hundred eighty-four overruling opinions, the most recent on the list being *Batson* v. *Kentucky* (1986), 476 U.S. 79, which overruled *Swain* v. *Alabama* (1965), 380 U.S. 202, in part.

tion of the white and "colored" races in railroad passenger cars and that anyone violating the separation could be fined and imprisoned. In a strong dissent, Justice Harlan stated:

"* * * But in view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. * * *" *Id.* at 559.

In 1954, the court was called upon to decide the question of whether segregation of children in public schools solely on the basis of race meets constitutional muster. In *Brown* v. *Bd. of Edn.* (1954), 347 U.S. 483, the states of Kansas, South Carolina, Virginia and Delaware either permitted or required racial segregation in public schools. The states argued that the doctrine of "separate but equal" approved in *Plessy* should control. The appellees in *Briggs* v. *Elliott,* one of the three cases decided with *Brown,* placed great weight on *stare decisis* to protect the institution of racial segregation. They argued that a whole social order rested on this institution.[9]

Notwithstanding this argument and the longstanding *Plessy* precedent, the court, in one of its finest hours, in a *unanimous* decision delivered by Chief Justice Warren, held that in the field of public education, the doctrine of "separate but equal" has no place. The court found that legally sanctioned racial segregation is usually interpreted as connoting the inferiority of blacks, which adversely affects the educational development of black children. "* * * Any language in

*Plessy* v. *Ferguson* contrary to this finding is rejected." *Id.* at 494-495.

Would any of those who maintain, on the basis of *stare decisis,* that we should not reconsider *Rocky I* also be prepared to argue that the United States Supreme Court should not have reconsidered *Plessy* and that *Brown,* whether resolved on institutional, political, social or purely legal grounds, should never have been decided? To so argue would be to say that segregation, regardless of our sacred Constitution, should be the law of our country.

Some will say: "But *Plessy* and *Brown* are old cases and ancient history." While there are many other examples of a more recent vintage than *Brown,* three will suffice.

On July 5, 1984, the United States Supreme Court ordered reargument in two cases raising the issue of whether the Fair Labor Standards Act could constitutionally apply to San Antonio's municipal transportation employees in light of *National League of Cities* v. *Usery* (1976), 426 U.S. 833. See 468 U.S. 1213-1214. The court, *sua sponte,* requested the parties to brief and argue the question of whether the principles of the Tenth Amendment, as set forth in *National League of Cities,* should be reconsidered. 468 U.S. at 1214.

This was a significant development. *National League of Cities* was decided by a five-to-four vote and, therefore, by a change in one vote, the case could be overruled. It was especially significant because *National League of Cities* itself had overruled a case decided only eight years before: *Maryland* v. *Wirtz* (1968), 392 U.S. 183. *Wirtz* had been a six-to-two decision.

Upon reargument, in 1985, of *Garcia* v. *San Antonio Metropolitan Transit Auth.* (1985), 469 U.S. 528, the court, in a five-to-four decision, over-

---

[9] Brief for Appellees on Reargument at 59-60 and 76-79, *Briggs* v. *Elliott* (1954), 347 U.S. 483.

ruled *National League of Cities.* The *Garcia* majority brushed aside any supposed precedential compulsion in the penultimate paragraph of a lengthy opinion. *Id.* at 557. Just as interesting is that two of the justices in the minority said that *Garcia* should itself be overruled at the first opportunity.[10]

Decisions like *Garcia* have led thoughtful commentators to suggest that constitutional law would be better off absent any formal legal concept of *stare decisis.*[11] While we do not advocate or endorse such a position, it is interesting to note that in the space of three days in June 1987, the court, in four cases, overruled prior decisions.[12] In only one of the four cases, *Puerto Rico* v. *Branstad* (1987), 483 U.S. 219, 226-229, did the court appear to give any serious attention to the question of *stare decisis.*

Even more recently, on April 25, 1988, the United States Supreme Court, in *Patterson* v. *McLean Credit Union* (1988), 485 U.S. ___, 99 L. Ed. 2d 879, 108 S. Ct. 1419, restored the case to its calendar for reargument. In this order, by a five-to-four vote (Chief Justice Rehnquist, Justices White, O'Connor, Scalia and Kennedy in the majority), the court, *sua sponte,* directed the parties "* * * to brief and

argue the following question: 'Whether or not the interpretation of 42 USC § 1981 * * * adopted by this Court in *Runyon* v. *McCrary,* 427 U.S. 160, 49 L. Ed. 2d 415, 96 S. Ct. 2586 (1976), should be reconsidered?' " *Id.* at ___, 99 L. Ed. 2d at 879-880, 108 S. Ct. at 1420.

The *Runyon* case involved the question of whether Section 1981 prohibits "* * * private, commercially operated, nonsectarian schools from denying admission to prospective students because they are Negroes, and, if so, whether that federal law is constitutional as so applied." *Id.* at 168. The *Runyon* court held that the statute did prohibit such discrimination, and that the statute so applied did not violate such constitutionally protected rights as free association. The vote in *Runyon* was seven to two, with then Justice and now Chief Justice Rehnquist and Justice White in dissent. Now, some twelve years after *Runyon* and without even a motion being filed to somehow bring back before the court this important civil rights issue, the court, with three new members, chose to consider whether *Runyon* should be overruled. *Patterson* at ___, 99 L. Ed. 2d at 880, 108 S. Ct. at 1420.

The majority made clear that such reconsideration was not a "first" for

---

[10] *Id.* at 580 (Rehnquist, J., dissenting); *id.* at 589 (O'Connor, J., dissenting).

[11] See James C. Rehnquist, The Power That Shall Be Vested In a Precedent: Stare Decisis, the Constitution and the Supreme Court (1986), 66 B.U.L. Rev. 345, 371-375.

[12] See *Welch* v. *Texas Dept. of Highways & Pub. Transp.* (1987), 483 U.S. ___, 97 L. Ed. 2d 389, 107 S. Ct. 2941 (overruling the quasi-constitutional holding in *Parden* v. *Terminal Ry. of Alabama*

*Docks Dept.* [1964], 377 U.S. 184); *Solorio* v. *United States* (1987), 483 U.S. ___, 97 L. Ed. 2d 364, 107 S. Ct. 2924 (overruling *O'Callahan* v. *Parker* [1969], 395 U.S. 258); *Tyler Pipe Industries, Inc.* v. *Washington Dept. of Revenue* (1987), 483 U.S. 232 (overruling *General Motors Corp.* v. *Washington* [1964], 377 U.S. 436); *Puerto Rico* v. *Branstad* (1987), 483 U.S. 219 (overruling *Kentucky* v. *Dennison* [1861], 65 U.S. [24 How.] 66).

the court. The majority's contention was supported by the citation of a large number of cases. *Id.* at ___, 99 L. Ed. 2d at 880-881, 108 S. Ct. at 1420-1421.

The majority made, among others, two points: "* * * It is surely no affront to settled jurisprudence to request argument on whether a particular precedent should be modified or overruled." *Id.* at ___, 99 L. Ed. 2d at 880, 108 S. Ct. at 1420. "* * * These actions do not mean that the Court has been insensitive to considerations of stare decisis, but only that we recognize it as ' "a principle of policy and not a mechanical formula" ' * * *." (Citations omitted.) *Id.* at ___, 99 L. Ed. 2d at 881, 108 S. Ct. at 1421.

Thus, we see that the current panel of the Supreme Court of the United States, as had many of its predecessor panels, has moved to reconsider a constitutional matter of deep concern to a majority of the sitting members of that court. In the case now before our court, a constitutional question is clearly involved. The precedent for reconsideration is overwhelming. The *duty* to do so is even more compelling.

Do all the foregoing examples portray the court as an unprincipled policy entity? We think not! *Stare decisis* "* * * is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience." Justice Frankfurter, writing for the court, in *Helvering* v. *Hallock* (1940), 309 U.S. 106, 119. It is a dynamic process. "* * * Those who

reject this vision of the Constitution and who insist on a definitive and static view of constitutional 'right' and 'wrong,' ultimately must rely on power, rather than on principle, to effect their constitutional change."[13] *Stare decisis* is *not* inflexibly applicable to constitutional interpretation.

Accordingly, for all the foregoing reasons and because *Rocky River* involves the interpretation of the Ohio Constitution by the *current* members of this court, we now move to meet our sworn duty and responsibilities.

III

Presumption of Constitutionality

In determining the constitutionality of R.C. 4117.14(I), we are cognizant of the long-established principle requiring courts to presume the constitutionality of legislative enactments. *State, ex rel. Jackman,* v. *Court of Common Pleas* (1967), 9 Ohio St. 2d 159, 161-162, 38 O.O. 2d 404, 405, 224 N.E. 2d 906, 909. This presumption can only be overcome by proof, *beyond a reasonable doubt,* that the legislation and the Constitution are clearly incompatible. *State, ex rel. Dickman,* v. *Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E. 2d 59, paragraph one of the syllabus. In our view, appellant has not sustained this heavy burden.

IV

The Law

R.C. 4117.14(I) provides:

"The issuance of a final offer settlement award constitutes a binding mandate to the public employer and the exclusive representative to take whatever actions are necessary to implement the award."

---

[13] Stone, Precedent, the Amendment Process, and Evolution in Constitutional Doctrine (1988), 11 Harv. J. of Law and Pub. Policy 67, 72.

Appellant challenges, on two grounds, the constitutionality of this section of the Public Employees' Collective Bargaining Act. Appellant first contends that R.C. 4117.14(I) intrudes upon appellant's powers of local self-government. Appellant cites Sections 3 and 7, Article XVIII of the Ohio Constitution and urges that R.C. 4117.14(I) violates those sections by usurping appellant's power to set the wages of its safety forces.

As a second proposition, appellant challenges R.C. 4117.14(I) on the basis that the section unconstitutionally delegates municipal legislative authority. Appellant contends the section fails to establish a procedure whereby the exercise of discretion by the conciliator can be effectively reviewed.

Appellees counter these arguments by maintaining that R.C. 4117.14(I) was enacted by the legislature for the protection of the health, safety, and welfare of the citizens of Ohio and, as such, is a general law applicable to municipalities, notwithstanding Section 3, Article XVIII of the Ohio Constitution. It is appellees' contention that R.C. Chapter 4117 (and specifically R.C. 4117.14[I]) address a matter of statewide concern and that the results of the collective bargaining process have significant extraterritorial effects which impact on the general public of the state more than the residents of any single municipality.

Appellees also contend that no municipal legislative authority is being delegated by the Act because the state statute (R.C. Chapter 4117) takes precedence over any conflicting legislation of a municipality. Further, appellees urge that in any event, it is permissible for the General Assembly to delegate discretionary functions to administrative officers so long as the delegation is accompanied by certain procedural safeguards.

Finally, appellees maintain that none of the discussion concerning home rule or unlawful delegation of legislative authority has any significance because Section 34, Article II of the Ohio Constitution clearly permits the General Assembly to pass laws providing for the comfort, health, safety and general welfare of all employees. Appellees contend that the additional language found in Section 34, Article II that no other provision of the Constitution shall impair or limit this power of the legislature ends the question.

A

Delegation of Municipal
Legislative Authority

We first deal with appellant's argument that R.C. 4117.14(I) constitutes an impermissible delegation of municipal legislative authority to the conciliator.

In *Blue Cross of N.E. Ohio* v. *Ratchford* (1980), 64 Ohio St. 2d 256, 18 O.O. 3d 450, 416 N.E. 2d 614, a case which both sides cite, this court held:

"A statute does not unconstitutionally delegate legislative power if it establishes, through legislative policy and such standards as are practical, an intelligible principle to which the administrative officer or body must conform and further establishes a procedure whereby exercise of the discretion can be reviewed effectively." *Id.* at syllabus.

It can readily be seen that R.C. 4117.14 does not unconstitutionally delegate legislative power within the meaning of *Ratchford*. A review of the statute reveals that it provides the conciliator with detailed guidelines under which to proceed. R.C. 4117.14(G)(7) provides as follows:

"After hearing, the conciliator shall resolve the dispute between the parties by selecting, on an issue-by-

issue basis, from between each of the party's [sic] final settlement offers, taking into consideration the following:

"(a) Past collectively bargained agreements, if any, between the parties;

"(b) Comparison of the issues submitted to final offer settlement relative to the employees in the bargaining unit involved with those issues related to other public and private employees doing comparable work, giving consideration to factors peculiar to the area and classification involved;

"(c) *The interests and welfare of the public, the ability of the public employer to finance and administer the issues proposed,* and the effect of the adjustments on the normal standard of public service;

"(d) The lawful authority of the public employer;

"(e) The stipulations of the parties;

"(f) Such other factors, not confined to those listed in this section, which are normally or traditionally taken into consideration in the determination of the issues submitted to final offer settlement through voluntary collective bargaining, mediation, fact-finding, or other impasse resolution procedures in the public service or in private employment." (Emphasis added.)

It is difficult to conceive how the General Assembly could have formulated more "practical" standards or a more "intelligible principle" within the meaning of *Ratchford, supra,* particularly given the purpose of the Act, which is to "promot[e] orderly and constructive relationships between all public employers and their employees." R.C. 4117.22. Finally,

after all this, the decision of the conciliator is expressly made subject to judicial review under R.C. Chapter 2711. R.C. 4117.14(H).

Accordingly, we find appellant's second proposition of law not well-taken.

### B

### Home Rule

Appellant's first proposition of law states:

"R.C. 4117.14(I) is unconstitutional because it would deny municipalities their power, guaranteed by sections 3 and 7 of Article XVIII of the Ohio Constitution, to determine municipal safety employee compensation, a power of local self-government."

Appellant argues that if R.C. 4117.14(I) is constitutional, then for all practical purposes, appellant's powers of local self-government are nonexistent.

Section 3, Article XVIII of the Ohio Constitution provides:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, *as are not in conflict with general laws.*" (Emphasis added.)

This court has already determined that "[t]he collective bargaining law of the state of Ohio is a law of a general nature. * * *" *Dayton F.O.P., supra,* at paragraph one of the syllabus. Section 3, Article XVIII *explicitly withholds* from municipalities the authority to exercise powers or adopt regulations which are in conflict with "general laws." The home-rule amendment, Section 7, Article XVIII, grants municipalities powers of home rule *"subject to the provisions of section 3 of this article * * *."* (Emphasis added.) Therefore, the power of home rule is

constitutionally limited to powers not in conflict with "general laws."[14]

The parties in the case at bar cite a number of cases from Ohio and foreign jurisdictions in support of their respective positions on the question of home rule and its application to R.C. 4117.14(I). Because we believe that Section 34, Article II of the Ohio Constitution governs this case and, consequently, the home-rule sections do not apply, we make no further comment on the home-rule arguments of the parties.

### C
### The Ohio Constitution:
### Section 34, Article II

Section 34, Article II of the Ohio Constitution provides:

"Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employes; *and no other provision of the constitution shall impair or limit this power.*" (Emphasis added.)

This provision constitutes a broad grant of authority to the legislature to provide for the welfare of all working persons, including local safety forces.

*Pension Fund, supra.* The provision expressly states in "clear, certain and unambiguous language" that *no other provision* of the Constitution may impair the legislature's power under Section 34. *Id.* at 107, 41 O.O. 2d at 412, 233 N.E. 2d at 137. This prohibition, of course, includes the "home rule" provision contained in Section 3, Article XVIII. *Id.* at 106, 41 O.O. 2d at 411, 233 N.E. 2d at 137.

R.C. Chapter 4117, the Public Employees' Collective Bargaining Act, is indisputably concerned with the "general welfare" of employees. Therefore, pursuant to Section 34, Article II, the power of the General Assembly to adopt the Act *may not be affected in any way by the "home rule" amendment.* The binding arbitration provision of R.C. Chapter 4117 is a valid exercise of the legislative function under Section 34, Article II.

It is argued by appellant that Section 34 has no application to the conciliation statute before us today, since Section 34 was intended to apply only to matters involving a minimum wage. In support of this proposition, appellant cites the debates on Section 34 which occurred when the proposal was presented to the 1912 constitutional

---

[14] But, see, *State, ex rel. Canada,* v. *Phillips* (1958), 168 Ohio St. 191, 5 O.O. 2d 481, 151 N.E. 2d 722, paragraph four of the syllabus, which, however, needs to be read in context with the issues involved in that case. *Canada* is a case involving civil service and concerns Section 10, Article XV of the Ohio Constitution. It does not deal in any way with Section 34, Article II, which is so central to the case before us today.

In any event, a review of the constitutional debates concerning Section 3, Article XVIII reveals that the narrow interpretation adopted by the *Canada* court is unwarranted. Mr. George W. Knight, a convention delegate and a chief proponent of the amendment, characterized its purpose as follows: "[T]his proposal undertakes * * * to provide that municipalities shall have the power to do those things which are not prohibited, that is, those things with reference to local government, with reference to the affairs which concern the municipality, which are not forbidden by the lawmaking power of the state, *or are not in conflict with the general laws of the state* under the police power and the general state regulation. * * *" (Emphasis added.) 2 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1913) 1433. Obviously, this characterization of Section 3, Article XVIII is totally inconsistent with the interpretation espoused by the *Canada* court.

convention for consideration. Appellant, in its reply brief, states: "* * * In fact, the *entire* debate on the amendment concerned its minimum wage provision *only.*" (Emphasis by *appellant.*) In support of this statement, appellant cites 2 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1912) 1328-1338.

We find this statement by appellant's counsel to be, *at best,* misleading. The fact that a considerable portion of the debate on Section 34 concerned a minimum wage does not signify that the proposed constitutional amendment only concerned a minimum wage. In fact, a *thorough* review of the minutes of the constitutional convention makes it abundantly clear that the debate about minimum wage occurred because this was the *only* part of the proposed amendment to which any delegates took serious exception. There can be no question that the purpose of the proposed constitutional amendment was much broader and that the delegates were fully aware of the scope of the amendment under consideration.

What is now Section 34, Article II of the Ohio Constitution was presented to the convention on January 24, 1912 as Proposal No. 122. 1 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1912) 106. When introduced, it was designated as a proposal "[r]elative to employment of women, children and persons engaged in hazardous employment." *Id.* The next day, January 25, 1912, the proposal was referred to the convention's Committee on Labor. *Id.* at 118.

Delegate Stilwell, of Cuyahoga County, was the chairman of the Labor Committee. *Id.* at 1 and 93. After consideration by the committee, on March 19, 1912, Stilwell reported Proposal No. 122 back to the convention with amendments. A specific amendment was to "* * * [s]trike out all after resolving clause and insert the following:

" 'Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage and providing for the comfort, health, safety and general welfare of all employes; and no other provision of the constitution shall impair or limit this power.' " *Id.* at 755.

The report was agreed to, the proposal read a second time and, as amended, ordered printed. *Id.* On April 22, 1912, Proposal No. 122 came before the convention for adoption. 2 Proceedings and Debates, *supra,* at 1328. The proposal was read a second time. Delegate Farrell from Cuyahoga County, whose occupation was listed as "waiter," spoke in favor of the proposal. *Id.* at 1328-1332. Mr. Farrell said: "Since this proposal has been on the calendar I have heard some little objection to it, *especially* with reference *to the clause* which would permit the legislature to pass minimum wage legislation, *and to that clause* I intend to direct my remarks *exclusively.* * * *" (Emphasis added.) *Id.* at 1328.

It is clear that Mr. Farrell, who was also a member of the Committee on Labor, knew that the proposal did not concern just a minimum wage. Other delegates spoke for and against the proposal. Probably the most notable was Judge Dennis Dwyer from Montgomery County, whose occupation was listed as "lawyer." Judge Dwyer, also a member of the Committee on Labor, was a man past eighty years of age and had been accorded the honor of being unanimously elected by his fellow delegates as the Temporary Chairman of the Convention. 1 Proceedings and Debates, *supra,* at 23.

Judge Dwyer certainly knew the

proposal was about more than a minimum wage. In a moving speech in support of the proposal, he said, in part: "[t]herefore, give your employes fair living wages, good sanitary surroundings during hours of labor, protection as far as possible against danger, a fair working day. Make his life as pleasant for him as you can consistent with his employment. * * *" 2 Proceedings and Debates, *supra,* at 1332-1333. After a heated debate, centering on whether the minimum wage clause should be included in the proposal, the proposal as submitted was approved with eighty voting yea and thirteen voting nay. *Id.* at 1338. Under the rules, the proposal was then referred to the Committee on Arrangement and Phraseology. *Id.*

On May 22, 1912, the Committee on Arrangement and Phraseology reported Proposal No. 122 to the convention and recommended its passage after amending it to strike out the previous title and inserting therefor "* * * section 34 * * * article II * * * — Welfare of employes." The report was approved, on this seventy-third day of the convention, and it was ordered that the proposal be placed on the convention's calendar the next day for the third reading. *Id.* at 1742.

The next day, May 23, 1912, Proposal No. 122 was read for the third time. Delegate Harris from Hamilton County, whose occupation was listed as "capitalist" (the only such listing among the one hundred nineteen delegates) offered an amendment. The amendment was to "[s]trike out in line 6 'a minimum wage.' " *Id.* at 1784. In presenting the amendment, Mr. Harris said: "The proposal with the *exception* of minimum wage seems so sound that I am very anxious to vote for it, and even if my amendment is tabled I state that I shall vote for same *because it contains so much* that appeals to me

that I do not want to oppose it * * *." *Id.* There was no question in Delegate Harris' mind that Proposal No. 122 concerned far more than just a minimum wage.

After another heated debate, one of the delegates moved to table Mr. Harris' amendment. *Id.* at 1786. The motion to table was carried and the question of whether Proposal No. 122 should pass was then submitted to the convention. By a vote of ninety-six yeas and five nays, the proposal was adopted, *id.,* and today appears in our Constitution as Section 34, Article II.

But none of this really makes any difference. The language of Section 34 is so clear and unequivocal that resort to secondary sources, such as the constitutional debates, is actually unnecessary. Where the language of a statute or constitutional provision is clear and unambiguous, it is the duty of courts to enforce the provision as written. *Bernardini* v. *Bd. of Edn.* (1979), 58 Ohio St. 2d 1, 12 O.O. 3d 1, 387 N.E. 2d 1222. "Debates of a constitutional convention are proper matter for consideration where they throw light on the correct interpretation of any provision of the Constitution, but if the provision is clear and may be read without interpretation, the discussion leading to its adoption is of no value, nor are the various statements by the members of the convention and the resolutions offered during the convention determinative of the meaning of the amendment." *State, ex rel. Harbage,* v. *Ferguson* (1941), 68 Ohio App. 189, 22 O.O. 139, 36 N.E. 2d 500, paragraph one of the headnotes, appeal dismissed (1941), 138 Ohio St. 617, 22 O.O. 152, 37 N.E. 2d 544.

Regardless of what was said or not said during the debates, the unalterable fact remains that Section 34, as it was ultimately adopted, transcends the limitations urged by appellant. If

the framers of our Constitution had intended this section to apply only to minimum wage, almost half of the forty-one words contained in this section must be regarded as mere surplusage, since it further provides that laws may be passed "fixing and regulating the hours of labor * * * and providing for the comfort, health, safety and general welfare of all employes * * *." Are we to believe, as appellant apparently does, that these words were not intended to have meaning? To ask the question is to answer it.

The same may be said of the final phrase of Section 34, which states that "* * * no other provision of the constitution shall impair or limit" the General Assembly's power to pass laws concerning the welfare of employees.[15] How can it be seriously maintained that the home-rule amendment is somehow exempt from this mandate? Section 34 could not be clearer or more unequivocal. Appellant's contention, that Section 34 does not mean what it so obviously says, is indefensible. This is especially true when one considers that this court has already held that Section 34 contains "clear, certain and unambiguous language" providing that "no other provision of the Constitution may impair the intent, purpose and provisions" of Section 34, including the home-rule amendment. *Pension Fund, supra,* at 107, 41 O.O. 2d at 412, 233 N.E. 2d at 137.

A review of the facts and holding in *Pension Fund, supra,* is extremely instructive. There, the municipality challenged the constitutionality of several sections of R.C. Chapter 742, which created a *state-controlled* disability and pension fund for the benefit of police and firefighters and their dependents. It was contended that these sections, and particularly R.C. 742.26, which required cities to transfer the assets of their police and firefighters' relief and pension funds to the state fund, violated various constitutional provisions, including the "home rule" sections. This court rejected these contentions, citing Section 34, Article II of the Ohio Constitution. *Id.* at 107, 41 O.O. 2d at 412, 233 N.E. 2d at 137. In so holding, this court ruled:

"The creation and the administration, management, and the control of a state police and firemen's disability and pension fund, as provided in Sections 742.01 to 742.49, inclusive, of the Revised Code, is [*sic*] a valid enactment of the General Assembly by virtue of the provisions of Section 34, Article II of the Constitution of Ohio." *Id.* at syllabus.

A closer look at the Revised Code sections upheld in *Pension Fund* against a home-rule attack reveals that these sections were considerably more intrusive on a municipality's power of home rule than the conciliation statute before us today. For example, at the time of the *Pension Fund* decision, R.C. 742.26 provided that "* * * the assets and liabilities of each police relief and pension fund * * * and of each firemen's relief and pension fund * * * shall be transferred to the police and firemen's disability and pension fund * * *" *controlled by the state* pursuant to R.C. 742.03. (131 Ohio Laws 303-304.) Former R.C. 742.27 provided that upon such transfer, the board of trustees of the state fund acquires "* * * all rights, interest and ownership in all of such assets." (131 Ohio

---

[15] This provision refers only to the power of the General Assembly to pass laws. *Fuldauer* v. *Cleveland* (1972), 32 Ohio

St. 2d 114, 123, 61 O.O. 2d 374, 379, 290 N.E. 2d 546, 552.

Laws 304.) R.C. 742.30 required cities transferring superseded funds to discharge all liabilities of such funds at certain minimum annual rates, beginning with two percent per year in 1969, and increasing to five percent per year in 1972 and each year thereafter for *fifty-five years.* (132 Ohio Laws, Part I, 395-396.) R.C. 742.33 and 742.34 *mandated* that *cities* shall pay to the state fund *an amount to be determined by the state board,* and even that such payments shall be made from the municipality's *general fund.* (131 Ohio Laws 308.)

Who were the members of this state board that had all this power and authority to order municipalities to pay out of their general funds whatever amounts the *board* determined would be necessary to keep the fund financially sound? The answer was to be found in R.C. 742.03: the board consisted of the Attorney General, the Auditor of State, a city fiscal officer, *two city police department employees, and two city or township fire department employees.* (132 Ohio Laws, Part I, 394-395.) This court, in 1967, upheld this provision as being within the authority of the General Assembly under the powers granted to it by Section 34, Article II of the Ohio Constitution. The home-rule amendment had to yield to the omnibus mandates of Section 34 and to the will of the General Assembly.

It can readily be seen that the statutory scheme upheld in *Pension Fund* constituted a substantial infringement of local powers of self-government. Cities were ordered by the state to surrender their own funds to the state on terms fixed by the state. Municipalities' "power of the purse" was not merely limited; it was bypassed completely. Under the conciliation statute before us today, the municipality retains considerably more

authority. With regard to wages, as well as other questions, the municipality may negotiate an appropriate settlement with safety forces employees. It is only when negotiations break down completely that the conciliator steps in, and even then the options from which the conciliator must choose are controlled to a large extent by the municipality. See R.C. 4117.14(G)(7). The *Pension Fund* holding that Section 34, Article II overrides the home-rule provision and that the state may intrude on local self-government to the degree allowed in that decision is doubly persuasive when applied to the case now before us. Can it be seriously argued that the conciliator provision now under scrutiny is more intrusive than the provisions upheld in *Pension Fund?* The answer is obvious.

Nor can the *Pension Fund* case be distinguished from the instant case on the basis that pensions are not "wages," and therefore not subject to mandatory collective bargaining under R.C. 4117.08(A). First, that statute requires collective bargaining of *"[a]ll matters pertaining to wages, hours, or terms and other conditions of employment * * *."* (Emphasis added.) Few would argue that pensions do not fall within this category. Second, the federal courts which have addressed the question under the National Labor Relations Act have overwhelmingly held that the term "wages" includes pensions. 18D Kheel, Business Organizations (1984), Section 19.02. See, also, *In re Inland Steel Co.* (1948), 77 NLRB 1.

It is quite interesting to note that this court, at the time the *Pension Fund* case was decided, was composed of Chief Justice Taft and Associate Judges Zimmerman, Matthias, O'Neill (later Chief Justice), Herbert (who wrote the opinion), Schneider and (Paul W.) Brown. That court *unani-*

*mously* found that Section 34, Article II was controlling.

Appellant's response to the *Pension Fund* case appears in its reply brief:

"Rarely cited in the reported case law, * * * [*Pension Fund*] is an aberration. The extravagant discussion of Article II, Section 34 and municipal home rule in the two and one/half page opinion was wholly unnecessary because there was no home rule issue facing the court. In short, the controversy was a sham; both this Court and Ohio home rule law were its victims. * * *"

In effect, appellant is saying the *Pension Fund* court was duped; the court did not recognize the issue before it and engaged in "unnecessary," "extravagant discussion." We do not look kindly on appellant's characterization of the *Pension Fund* court. Balancing our knowledge of the fine legal minds serving as members of the *Pension Fund* court against appellant's obvious vested interest in the outcome of the case at bar, it is not difficult to determine where objectivity concerning the issues and holding of *Pension Fund* would most likely lie. In any such contest, appellant loses hands down.

In sum, Section 34, Article II of the Ohio Constitution and the *Pension Fund* case are clear and unequivocal. Together they dictate the result in this case.

Appellant's first proposition of law is not well-taken.

### D
### City Budgets and the SERB Experience

In an attempt to defeat the conciliation provisions of R.C. Chapter 4117, appellant points to the alleged power of the conciliator to bankrupt a municipality by adopting a union salary demand which the employer cannot afford. This argument, which has a certain potency at first blush, is,

in reality, unfounded. The employer's ability to pay is a *mandatory* consideration for the conciliator under the provisions of R.C. 4117.14(G)(7). That statute directs that the conciliator "* * * shall resolve the dispute between the parties by selecting, on an issue-by-issue basis, from between each of the party's [*sic*] final settlement offers, *taking into consideration the following*:

"* * *

"(c) * * * *the ability of the public employer to finance and administer the issues proposed* * * *." (Emphasis added.)

It could perhaps be argued that this statutory provision does not prevent a conciliator from adopting an employee proposal which would spell financial disaster for the public employer. However, the doomsayers who warn of such calamities are ignorant of the realities. Past practice has demonstrated that conciliators do not hesitate to reject an employee demand which they find to be beyond the financial means of the particular public employer. Likewise, in the fact-finding stage, fact-finders have demonstrated a readiness to accept the employer's claim of inability to pay.

For example, in a dispute between the Jackson County Sheriff and the Fraternal Order of Police ("FOP"), the conciliator rejected the final wage offer of the FOP on the basis that the public employer was in a state of financial distress, and could not afford the increase. *In the Matter of Conciliation Between the Jackson County Sheriff and Fraternal Order of Police* (May 14, 1987), SERB case Nos. 86-MED-09-0900, 86-MED-09-0901, and 86-MED-09-0902. Similarly, a conciliator rejected a pay increase in a dispute between the FOP and the Trumbull County Sheriff's Department, again on the ground that the employer had an inability to pay. *In the Matter of Im-*

*passe Between Trumbull County Sheriff's Department and Fraternal Order of Police* (Mar. 16, 1987), SERB case Nos. 86-MED-09-918 through 922. The employer's inability to pay was also the basis for the rejection of pay increases in the following decisions by fact-finders: *In the Matter of Impasse Between the City of Cortland and the Fraternal Order of Police* (July 19, 1986), SERB case No. 86-MED-04-0465; *In the Matter of Sheriff of Wyandot County and Fraternal Order of Police* (Dec. 13, 1985), SERB case Nos. 85-MF-09-4238 and 85-MF-09-4239; *In the Matter of City of Washington Court House and Internatl. Assn. of Firefighters, Local 2474* (Nov. 1, 1984), SERB case No. 84-MF-05-1170. Thus, it can be seen that where an employer's claim of inability to pay is bona fide, it is not likely to be ignored. In fact, the above decisions show that fact-finders and conciliators have been very careful to consider claims of financial incapacity, and will readily accept these claims in appropriate cases. Thus, when one understands the SERB experience with these cases, the dire predictions of municipal bankruptcies caused by unbridled conciliators may be put into proper perspective.

## V

## Public Policy

By enacting R.C. 4117.14(I), the General Assembly recognized the need to provide some mechanism (other than the strike option) to bring about final resolution of an impasse in bargaining between a public employer and its safety forces. The public policy underlying this binding arbitration requirement is compelling.

R.C. 4117.14(I) provides that the decision of a conciliator in a collective bargaining dispute between a public employer and its safety forces "* * * constitutes a binding mandate to the public employer and the exclusive representative [of such safety forces] to take whatever actions are necessary to implement the award." Conciliation is the final of several steps which the parties may take under R.C. 4117.14 in their effort to resolve a collective bargaining dispute. Public employees who are not members of safety forces need not proceed to binding conciliation. Such employees have the option to strike under R.C. 4117.14(D)(2), an option which was not granted to safety forces. In withholding the right to strike from such employees, the General Assembly was obviously concerned with the dangers such strikes would pose to the public safety and welfare. The General Assembly wisely recognized, however, that without the right to strike, safety forces would have little strength to bring to the bargaining table. To compensate, the legislature provided for binding arbitration so that members of a safety force and their employer may obtain independent, binding review of their contract proposals. The decision of the conciliator is binding *on both parties,* whatever that decision may be. For safety forces, R.C. 4117.14(I) is the heart of the Act. Absent binding conciliation, the bargaining rights of safety forces would become virtually useless.

Given the history of public employer-safety employee relations in this state prior to the passage of R.C. Chapter 4117,[16] the wisdom of the

---

[16] In 1972, Ohio was tied for fourth place in the nation in the number of strikes by safety forces. By 1973, Ohio had moved up to second place. There were six strikes by police and firefighters in this state in 1975, again placing Ohio second in the nation in the frequency of such strikes. The next year, 1976, saw the number of safety forces strikes increase by half, to nine. That year, Ohio gained the dubious distinction of

General Assembly in promulgating the Act becomes even more obvious. During those turbulent days, public employees, including safety forces, were also prohibited from striking, but frustrations stemming from employee powerlessness frequently erupted into illegal strikes. The General Assembly has put an end to such chaos, particularly where safety forces are concerned, by enacting R.C. Chapter 4117, the Public Employees' Collective Bargaining Act. In doing so, the General Assembly has obviously decided that binding conciliation is the most appropriate method for dealing with impasses between safety forces and their employers. Whether we, as members of this court, agree or disagree with that assessment is, or should be, irrelevant. As recently stated by Justice Wright, "it is not the function of the courts to decide constitutional cases on the basis of . its members' personal views. This court must give the laws enacted by our elected representatives every intendment of constitutionality. * * *" *Central Ohio Transit Auth.* v. *Transport Workers Union of America, Local 208* (1988), 37 Ohio St. 3d 56, 64, 524 N.E. 2d 151, 157 (Wright, J., concurring in the syllabus and in the judgment).

## Conclusion

Accordingly, we hold that the binding mandate provided in R.C. 4117.14 (I) is not an unlawful delegation of legislative authority as it serves the purpose of promoting orderly public sector labor relations, contains sufficient procedural standards and safe- guards and provides for effective judicial review.

We further hold that the Ohio Public Employees' Collective Bargaining Act, R.C. Chapter 4117, and specifically R.C. 4117.14(I), are constitutional as they fall within the General Assembly's authority to enact employee welfare legislation pursuant to Section 34, Article II of the Ohio Constitution. Section 3, Article XVIII of the Ohio Constitution, the home-rule provision, may not be interposed to impair, limit or negate the Act.

The judgments rendered by this court in *Rocky River* v. *State Emp. Relations Bd.* (1988), 39 Ohio St. 3d 196, 530 N.E. 2d 1, and *Rocky River* v. *State Emp. Relations Bd.* (1988), 40 Ohio St. 3d 606, 533 N.E. 2d 270, are vacated and held for naught. Further, any language in *Twinsburg* v. *State Emp. Relations Bd.* (1988), 39 Ohio St. 3d 226, 530 N.E. 2d 26, which is inconsistent with this opinion is overruled.

The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

SWEENEY, H. BROWN and RESNICK, JJ., concur.

MOYER, C.J., HOLMES and WRIGHT, JJ., dissent.

MOYER, C.J., dissenting. For the reasons stated in the majority opinion in *Rocky River* v. *State Emp. Relations Bd.* (1988), 39 Ohio St. 3d 196, 530 N.E. 2d 1, and in Justice Wright's analysis of Section 34, Article II of the

---

ranking first in the nation, a position which we retained for three of the following four years. In 1980, Ohio experienced *fifteen* strikes by safety forces, involving 2,300 workers and costing 6,800 lost workdays. Work Stoppages in Government, 1972- 1980, United States Department of Labor, Bureau of Labor Statistics Reports Nos. 434, 437, 453, 483, 532, 554, 582, 629 and Bulletin No. 2110. Clearly, the situation had reached crisis proportions.

Constitution of Ohio, and because of the effect the majority opinion herein would have upon the substantial case law of Ohio regarding home-rule authority of charter cities, I dissent from the majority opinion.

HOLMES, J., dissenting. Seldom, if ever, have I observed an author of an opinion reach out peripherally in so many directions in an attempt to authoritatively support an untenable legal position. The reader is inundated with a multitude of citations and a bulk of material running the gamut of quotations from historically well-known United States Supreme Court Justices and legal scholars to citations from Ohio newspaper editorial comment.

In reaching out for case material to bulwark his position, the author leads us through a tortuous path of United States Supreme Court opinions ranging from extradition law through commerce law to civil rights law, presenting in effect something for everyone. Basically, he cuts a piece of the American legal pie for everyone to consume — everyone, of course, except the municipalities and their officials from whom he has yanked the mantle of home-rule powers granted by Section 3, Article XVIII of the Ohio Constitution (and from the citizenry who must pay the tab of government).

The author of this opinion initiates us with the broad blast that "the moment has now come to place at rest the issue presented by this case." This the now minority of the court thought had been done by the prior majority of this court in the first *Rocky River* opinion of Chief Justice Moyer. The events that have transpired since that opinion have shown that the now majority considered such prior determination to be only a conditional order of the court — conditioned, that is, upon the later con-

stituted panel of this court. What gossamer fabric with which to sew up our jurisprudential garment!

The author vaults over the procedural morass of this case by stating in effect, " 'nuff said." However, enough cannot· be said of the roughshod plowing asunder of the regulations and past procedure of this court in order to again reach the merits of this case by a more favorably inclined panel. Upon the procedural aspect of this case, in addition to re-embracing my comments in dissent upon the motion for reconsideration published in 41 Ohio St. 3d 602, 605-610, 535 N.E. 2d 657, 660-664, I add the following.

This case had been determined by the prior majority of this court in the opinion and judgment issued on November 2, 1988. On November 14 motions were filed by the appellees, in accord with Section 1, Rule IX of the Supreme Court Rules of Practice, for a rehearing of the matter. One of the movants, in the alternative, asked for a clarification of the opinion as issued.

The motions for rehearing were denied by entry of the court dated December 22, 1988. Although not required to do so, the Chief Justice, who had written the prior majority opinion, set forth in such court order denying a rehearing a clarification of the prior opinion. Under no reasonable interpretation of the court rules could this be considered a granting of a rehearing, or considered as establishing a new date from which yet another motion for rehearing could be filed.

Additionally, the position of the author of the majority opinion that the motions of the appellees could be considered as motions for reconsideration is pure sophistry. In the first instance, this court has no such rule providing for a motion for reconsideration as have the courts of appeals. Secondly, without such a rule, the majority's *sua*

*sponte* allowance of such a motion as was done here is purely and simply unlawful, not just an abuse of discretion.

Relative to the reliance of the majority upon Section 34, Article II as being the fount from which their opinion flows, I merely shall reply, nonsense! This argument has been rejected by this court upon a number of occasions. Such section was not meant to override the home-rule provisions of Section 3, Article XVIII. As to this area of the majority opinion, I join in Justice Wright's dissent.

As to the major issue presented within this case, that of the applicability of the home-rule provisions to these negotiations for salaries for safety forces, I again embrace the law as enunciated by Chief Justice Moyer within the original *Rocky River* opinion.

For all the above reasons, I dissent.

WRIGHT, J., dissenting. At the outset I must say that the majority opinion is a breathtaking and ofttimes scholarly exercise. However, in the effort to achieve a result that meets the particularized need of the appellees, the lead opinion has, in my view, created some most unfortunate jurisprudence.

Before dealing with the untimely demise of the right of local government to order its own affairs, a few kind words are in order with respect to other portions of Justice Douglas' opinion. The majority's articulate dissertation concerning the doctrine of *stare decisis* carefully distinguishes between cases involving constitutional concepts and such matters as statutory interpretation, procedural issues, and the common law. This effort is both timely and worthwhile. I am satisfied that if we follow the majority's analysis as to this dichotomy in the future, the Bar and our citizenry will be well-served. Likewise, Justice Douglas' discussion of the desirability of judicial deference to the will of the legislature is right on target. I readily accept the strong public policy considerations which mandate a strong presumption of constitutionality for all legislation. Likewise, I recognize there are valid public policy considerations undergirding the concept of mandatory arbitration for labor disputes between government and its safety forces. See *Rocky River* v. *State Emp. Relations Bd.* (1988), 39 Ohio St. 3d 196, 222-224, 530 N.E. 2d 1, 23-24 (Douglas, J., dissenting). For my part, it was a difficult call in rejecting the "police power" arguments that were made in this case. There is a strong case that can be made for the fact that a massive work stoppage in one of our major cities would be a matter of genuine statewide concern.[17] But it must be remembered that such a happening with its attendant dangers to the public would presuppose a large number of our safety forces disregarding their responsibility to maintain law and order. Be that as it may, the majority has treated the constitutional doctrine of home rule as a failed concept and discarded local government as mere surplusage. Unfortunately, it has rejected without meaningful discussion the rationale rendered by this court six short months ago, and discarded without citation or comment almost a score of our previous cases.[18]

---

[17] For an excellent analysis of these considerations, see *Kettering* v. *State Emp. Relations Bd.* (1986), 26 Ohio St. 3d 50, 26 OBR 42, 496 N.E. 2d 983.

[18] Notwithstanding the majority's unsupported statement that "the home-rule sections do not apply," clearly at issue here is the freedom to exercise all powers of local

## I

When we look at the bottom line, the majority has indicated *without equivocation* that Section 34, Article II of the Ohio Constitution, which authorizes the passage of laws dealing with wages and hours *and* (laws) "* * * providing for the comfort, health, safety and general welfare of all employes," overrides *all* other provisions of the Ohio Constitution. As shall be demonstrated below, the majority has elevated the "general welfare" language contained in Section 34, Article II far beyond its original purpose. What is equally disquieting is that this is the first time a majority of this court ever "discovered" the awesome scope of this provision, save the one solitary pro-

nouncement in *State, ex rel. Bd. of Trustees of Pension Fund, v. Bd. of Trustees of Relief Fund* (1967), 12 Ohio St. 2d 105, 41 O.O. 2d 410, 233 N.E. 2d 135.[19]

I simply cannot accept the notion that the delegates to the 1912 Constitutional Convention intended to, in effect, discard all other provisions of the Ohio Constitution, giving the General Assembly carte blanche to legislate changes in our Constitution without the bothersome process of submitting these matters to a vote of the people. I think it is worthwhile to take a look at just a few of the rights that most citizens take for granted but must now take a back seat to the "general welfare" clause noted above.

Consider, if you will, Section 1, Ar-

---

self-government guaranteed to our municipalities in Sections 3 and 7, Article XVIII of our Constitution. It is beyond question that these powers of local self-government include, if nothing else, the power to make decisions regarding financial affairs affecting only local self-government. By holding that such matters can be taken out of the hands of elected municipal officials, the majority ignores established and heretofore well-accepted precedent to the contrary. As stated in *Benevolent Assn.* v. *Parma* (1980), 61 Ohio St. 2d 375, 383, 15 O.O. 3d 450, 455, 402 N.E. 2d 519, 525, "[i]t has been firmly established that the ability to determine the salaries paid to city employees is a fundamental power of local self-government." See *State, ex rel. Mullin,* v. *Mansfield* (1971), 26 Ohio St. 2d 129, 132, 55 O.O. 2d 239, 241, 269 N.E. 2d 602, 604, certiorari denied (1981), 404 U.S. 985 (recognizing the power of a noncharter city to establish by ordinance the pay scales of its civil service classifications).

The holdings in *Benevolent Assn.* v. *Parma* and *State, ex rel. Mullin,* v. *Mansfield* are consistent with the countless cases in which the power of home rule has been held to include the power to make local governance and financial decisions. See, *e.g., Teamsters Local Union No. 377* v.

*Youngstown* (1980), 64 Ohio St. 2d 158, 18 O.O. 3d 379, 413 N.E. 2d 837 (power to determine compensation of employees); *State, ex rel. Canada,* v. *Phillips* (1958), 168 Ohio St. 191, 5 O.O. 2d 481, 151 N.E. 2d 722 (power to appoint city police officers); *Craig* v. *Youngstown* (1954), 162 Ohio St. 215, 55 O.O. 110, 123 N.E. 2d 19 (power to establish municipal employee pay scales); *State, ex rel. Bailey,* v. *George* (1915), 92 Ohio St. 344, 110 N.E. 951 (power to select own officers); *Fitzgerald* v. *Cleveland* (1913), 88 Ohio St. 338, 103 N.E. 512 (power to set the procedure for nomination of officers). See, also, *State Personnel Bd. of Review* v. *Bay Village Civil Service Comm.* (1986), 28 Ohio St. 3d 214, 28 OBR 298, 503 N.E. 2d 518; *State, ex rel. Vukovich,* v. *Youngstown Civil Service Comm.* (1982), 69 Ohio St. 2d 16, 23 O.O. 3d 42, 430 N.E. 2d 452; *Hile* v. *Cleveland* (1928), 118 Ohio St. 99, 160 N.E. 621; *State, ex rel. Vogt,* v. *Donahey* (1923), 108 Ohio St. 440, 140 N.E. 609; *State, ex rel. Lentz,* v. *Edwards* (1914), 90 Ohio St. 305, 107 N.E. 768.

[19] Cf. the lead opinion in *Central Ohio Transit Auth.* v. *Transport Workers Union of America, Local 208* (1988), 37 Ohio St. 3d 56, 524 N.E. 2d 151, in which three justices concurred.

ticle I of the Ohio Constitution which declares the right to freedom and protection of property,[20] or Section 2, Article I, which declares the right to alter, reform, or abolish government, and repeal special privileges.[21] Review, if you will, Section 5, Article I, providing for trial by jury and reform in the civil jury system.[22] Review Section 11, Article I, covering freedom of speech and of the press.[23] See, also, Section 16, Article I, providing for redress in the courts.[24] Finally consider Section 20, Article I, reserving power to the people.[25]

Some might suggest that the basic rights noted above are mere surplusage as the protections guaranteed by the United States Constitution remain intact.[26] But, imagine our citizenry's surprise when it discovers that the legislative three-reading requirement[27] and the rights of a public initiative and referendum[28] are potentially in-

[20] "All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."

[21] "All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the general assembly."

[22] "The right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury."

[23] "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. * * *"

[24] "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. * * *"

[25] "This enumeration of rights shall not be construed to impair or deny others re-

tained by the people; and all powers, not herein delegated, remain with the people."

[26] However, in *Scott* v. *News-Herald* (1986), 25 Ohio St. 3d 243, 25 OBR 302, 496 N.E. 2d 699, this court overruled *Milkovich* v. *News-Herald* (1984), 15 Ohio St. 3d 292, 15 OBR 424, 473 N.E. 2d 1191, and relied on *state* as well as federal constitutional guarantees to uphold the dismissal of the plaintiff's libel action: "We find the article [which was the subject of the action] to be an opinion, protected by Section 11, Article I of the Ohio Constitution as a proper exercise of freedom of the press." *Scott, supra,* at 244, 25 OBR at 303, 496 N.E. 2d at 701.

[27] This requirement is found in Section 15(C), Article II of the Ohio Constitution:
"Every bill shall be considered by each house on three different days, unless two-thirds of the members elected to the house in which it is pending suspend this requirement, and every individual consideration of a bill or action suspending the requirement shall be recorded in the journal of the respective house. * * *"

[28] Section 1a, Article II:
"The first aforestated power reserved by the people is designated the initiative, and the signatures of ten per centum of the electors shall be required upon a petition to propose an amendment to the constitution. When a petition signed by the aforesaid required number of electors, shall have been filed with the secretary of state, and verified as herein provided, proposing an amendment to the constitution, the full text

operative. Consider the Governor's chagrin when he finds that his power of veto[29] and the one-issue mandate for a special legislative session[30] have been brought into question. Likewise, interested citizens may be dismayed to find that open sessions of the General Assembly as mandated by Section 13, Article II of the Ohio Constitution no longer apply when "employee welfare" legislation is under considera-

tion. I simply cannot fathom a course of reasoning that would sanction, for example, the abolition of all local civil service systems and mandate that all public employees, state, local, and county, be placed under a vast statewide bureaucracy. Likewise, I cannot believe that we have authorized the General Assembly, using the aegis of the "general welfare" section, to mandate the closure of what are now

---

of which shall have been set forth in such petition, the secretary of state shall submit for the approval or rejection of the electors, the proposed amendment, in the manner hereinafter provided, at the next succeeding regular or general election in any year occurring subsequent to ninety days after the filing of such petition. * * *"

Section 1c, Article II:

"The second aforestated power reserved by the people is designated the referendum, and the signatures of six per centum of the electors shall be required upon a petition to order the submission to the electors of the state for their approval or rejection, of any law, section of any law or any item in any law appropriating money passed by the general assembly. No law passed by the general assembly shall go into effect until ninety days after it shall have been filed by the governor in the office of the secretary of state, except as herein provided. When a petition, signed by six per centum of the electors of the state and verified as herein provided, shall have been filed with the secretary of state within ninety days after any law shall have been filed by the governor in the office of the secretary of state, ordering that such law, section of such law or any item in such law appropriating money be submitted to the electors of the state for their approval or rejection, the secretary of state shall submit to the electors of the state for their approval or rejection such law, section or item, in the manner herein provided, at the next succeeding regular or general election in any year occurring subsequent to sixty days after the filing of such petition, and no such law, section or item shall go into effect

until and unless approved by a majority of those voting upon the same. If, however, a referendum petition is filed against any such section or item, the remainder of the law shall not thereby be prevented or delayed from going into effect."

[29] This power is granted by Section 16, Article II:

"If the governor approves an act, he shall sign it, it becomes law and he shall file it with the secretary of state.

"If he does not approve it, he shall return it with his objections in writing, to the house in which it originated, which shall enter the objections at large upon its journal, and may then reconsider the vote on its passage. * * *

"* * *

"The governor may disapprove any item or items in any bill making an appropriation of money and the item or items, so disapproved, shall be void, unless repassed in the manner prescribed by this section for the repassage of a bill."

[30] Such sessions are provided for in Section 8, Article III:

"The governor on extraordinary occasions may convene the general assembly by proclamation and shall state in the proclamation the purpose for which such special session is called, and no other business shall be transacted at such special session except that named in the proclamation, or in a subsequent public proclamation or message to the general assembly issued by the governor during said special session, but the general assembly may provide for the expenses of the session and other matters incidental thereto."

public records pertaining to hiring criteria and the like of state or city employees.

In stark, plain terms the majority has reached the incredible result that *any* legislation passed for the stated purpose of promoting the "general welfare of all employes" may render any other specific provision of the Constitution null and void.

### A

The majority opinion concedes that the origins of Section 34, Article II of the Constitution lay in a proposal " '[r]elative to employment of women, children and persons engaged in hazardous employment.' " The majority then quotes snippets of testimony from a "waiter," an eighty-year-old lawyer, and a "capitalist" in general support of its central premise. Any student of constitutional law must be aware of

the raging controversy that surrounded the efforts to pass state and later federal legislation to regulate hours, wages, and the labor of women and children during the early years of this century. The leading case in this field was *Lochner* v. *New York* (1905), 198 U.S. 45, in which the Supreme Court struck down a New York law setting a sixty-hour-per-week maximum for work in bakeries on grounds that it violated the freedom of contract guaranteed by the Due Process Clause of the Fourteenth Amendment. Paragraphs one and four of the headnotes of that case illustrate the incredibly harsh result achieved in that decision and a series of cases that would follow.[31] Legislation regulating the form and amount of wages was similarly invalidated, in both state and federal courts.[32]

While the majority offers up a cap-

---

[31] "The general right to make a contract in relation to his business is part of the liberty protected by the Fourteenth Amendment, and this includes the right to purchase and sell labor, except as controlled by the State in the legitimate exercise of its police power.

"\* \* \*

"Section 110 of the labor law of the State of New York, providing that no employes shall be required or permitted to work in bakeries more than sixty hours in a week, or ten hours a day, is not a legitimate exercise of the police power of the State, but an unreasonable, unnecessary and arbitrary interference with the right and liberty of the individual to contract, in relation to labor, and as such it is in conflict with, and void under, the Federal Constitution."

This analysis also prevailed in the state courts. The freedom to contract was seen as fundamental to state property and due process guarantees. See, *e.g., Ritchie* v. *People* (1895), 155 Ill. 98, 40 N.E. 454; *Palmer & Crawford* v. *Tingle* (1896), 55 Ohio St. 423, 45 N.E. 313, paragraph one of the syllabus. Nevertheless, laws regulating the hours of labor in dangerous occupations were

generally upheld by the state courts despite their interference with contractual liberty. See, *e.g., State* v. *Cantwell* (1904), 179 Mo. 245, 78 S.W. 569; *State* v. *Thompson* (1906), 15 Wyo. 136, 87 P. 433; contra *In re Morgan* (1899), 26 Colo. 415, 58 P. 1071. However, in nonhazardous industries such laws were frequently invalidated on freedom of contract grounds. See, *e.g., Low* v. *Rees Printing Co.* (1894), 41 Neb. 127, 59 N.W. 362.

Regulation of the hours of labor for women generally fared better against the freedom of contract argument. In *Muller* v. *Oregon* (1908), 208 U.S. 412, the court upheld an Oregon law which forbade females employed in any mechanical establishment, factory, or laundry from working more than ten hours a day. See, also, *Bosley* v. *McLaughlin* (1915), 236 U.S. 385. However, even laws of this nature were in some states struck down as violating the freedom of contract guaranteed by state constitutional due process and property clauses. See, *e.g., Ritchie* v. *People* (1895), 155 Ill. 98, 40 N.E. 454; *People* v. *Williams* (1907), 189 N.Y. 131, 81 N.E. 778.

[32] In many cases laws requiring the

sulized view of the constitutional debates to support its broad interpretation of Section 34, Article II, it also states in effect that any review of the debates is "unnecessary." If the question were whether the provision authorizes the establishment of a minimum wage, I would agree that the language on that point is unambiguous, and resort to the debates thereon would shed no further light on the question. However, what the majority is attempting to accomplish here is the expansion of the term "general welfare" far beyond what was conceivably intended. The fact that this argument can even be made is proof, to me, that the provision has some ambiguity.

The majority loses sight of the fundamental principle that the polestar of constitutional construction is to ascertain and give effect to the real intentions of the language used and the people adopting it. *Castleberry* v. *Evatt* (1946), 147 Ohio St. 30, 33 O.O. 197, 67 N.E. 2d 861, paragraph one of the syllabus; *Shryock* v. *Zanesville* (1915), 92 Ohio St. 375, 110 N.E. 937. Moreover, it is axiomatic that in such construction "unreasonable or absurd consequences should, if possible, be

avoided." *Castleberry, supra,* at paragraph two of the syllabus. Because I feel the majority's interpretation of Section 34, Article II is unreasonable, I am compelled to call attention to the statements made throughout the debate on this provision that clearly reveal the context in which the proposal was offered and that are patently ignored by the majority.[33]

A careful review of the 1912 constitutional debates reveals that the *only* purpose for the language that the majority now discovers is all powerful and completely subsumes the whole of the Constitution was to protect men, women and children from the powerful proscription against interference with one's right to contract. This threat to wage and hour legislation disappeared with the line of cases which evolved in the late 1930s. See, *e.g., West Coast Hotel* v. *Parrish* (1937), 300 U.S. 379 (overruling *Adkins* v. *Children's Hosp.* [1923], 261 U.S. 525, and upholding a Washington statute establishing a minimum wage law for women and minors); *United States* v. *Darby* (1941), 312 U.S. 100 (upholding federal statute fixing minimum wage and maximum hours of workers in interstate commerce).[34]

payment of wages at regular intervals and in official United States currency were held invalid. See, *e.g., Godcharles* v. *Wigeman* (1886), 113 Pa. St. 431, 6 A. 354; *State* v. *Goodwill* (1889), 33 W. Va. 179, 10 S.E. 285.

Even minimum wage legislation for women and children was invalidated on freedom of contract grounds. See, *e.g., Adkins* v. *Children's Hosp.* (1923), 261 U.S. 525; *Topeka Laundry Co.* v. *Court of Indus. Relations* (1925), 119 Kan. 12, 237 P. 1041; *People, ex rel. Tipaldo,* v. *Morehead* (1936), 270 N.Y. 233, 200 N.E. 799.

[33] As was aptly stated by this court in *Cleveland* v. *Bd. of Tax Appeals* (1950), 153 Ohio St. 97, 103, 41 O.O. 176, 179, 91 N.E. 2d 480, 484:

"The purpose of the amendment, and the reasons for, and the history of its adoption, are pertinent in determining the meaning of the language used, for when the language is obscure or of doubtful meaning the court may, with propriety, recur to the history of the time when it was passed, to the attending circumstances at the time of adoption, to the cause, occasion or necessity therefor, to the imperfections to be removed or the mischief sought to be avoided and the remedy intended to be afforded." See, also, *State, ex rel. Swetland,* v. *Kinney* (1982), 69 Ohio St. 2d 567, 23 O.O. 3d 479, 433 N.E. 2d 217; *State, ex rel. Horner,* v. *Anderson* (1975), 41 Ohio St. 2d 166, 70 O.O. 2d 311, 324 N.E. 2d 572.

[34] *West Coast Hotel* and *Darby* followed

Turning to the proceedings and debates on Section 34, Article II, appellant is correct in noting that virtually the entire debate on Proposal No. 122 (*i.e.*, Section 34, Article II) focused on the minimum wage issue. However, it must be said that the majority correctly asserts that the proposal encompassed more than that single provision. The fact that an amendment was proposed to strike the words "minimum wage" is ample support itself for this statement.[35] However, a review of the *entire* debate, including the minimum wage discussions, reveals the overall context in which the proposal was offered. That was a desire among the drafters to improve the working conditions of men, women, and children in terms of the number of hours of work each day, the minimum wage to be paid, and the environment in which work was being performed. It is abundantly clear that the proposal's sole aim was to provide relief for those workers suffering in "sweatshop" industries and to override the constitutional proscription against interference with the right to contract.

The majority concludes that be-

cause a minimum wage was not the only issue included in Proposal No. 122 then *any* issue, even remotely connected with employee welfare, should be included. This unwarranted leap in reasoning ignores practically every recorded statement on the proposal, *including those on which the majority relies*. Delegate Dwyer (the majority's octogenarian lawyer) did indeed state that the proposal "was about more than a minimum wage." His statement, quoted by the majority, reveals what he thought was the proposal's aim: "Therefore, give your employes fair living wages, good sanitary surroundings during hours of labor, protection as far as possible against danger, a fair working day. Make his life as pleasant for him as you can consistent with his employment." 2 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1912) 1332-1333 (hereinafter "Proceedings and Debates"). I suggest that any fair-minded reader of the debates could only conclude that the section in question refers to wages, hours, and sanitary conditions in industry.

Moreover, the references to im-

---

the earlier ruling in *Nebbia* v. *New York* (1934), 291 U.S. 502, which had upheld the power of the state of New York to regulate prices in the dairy industry.

The evolution in the United States Supreme Court on these questions was mirrored at the state level. By the late 1930s, state court decisions consistent with the *Lochner* analysis had been discarded and replaced with a more progressive view of the state's police power. The freedom of contract doctrine receded from view in this context. See, *e.g.*, *Mary Lincoln Candies, Inc.* v. *Dept. of Labor* (1942), 289 N.Y. 262, 45 N.E. 2d 434 (upholding state minimum wage law for women and children); *Strain* v. *Southerton* (1945), 75 Ohio App. 435, 31 O.O. 250, 62 N.E. 2d 633, affirmed (1947), 148 Ohio St. 153, 35 O.O. 166, 74 N.E. 2d 67 (same).

[35] The majority is correct in noting that if Section 34, Article II applied only to minimum wage legislation the balance of the provision would be "mere surplusage." However, query whether the majority's extremely broad interpretation of "general welfare" does not have a similar effect. Would not maximum hour and minimum wage legislation qualify as being within the general welfare of employees, such that their mention in the provision is also "mere surplusage"? Moreover, do we not also find "mere surplusage" in Section 35, Article II, as the workers' compensation system certainly promotes the general welfare of employees? Consider also the surplusage contained in Sections 33 and 37, Article II. Reading the "general welfare" language of Section 34, Article II as broadly as the majority does renders these other provisions completely unnecessary.

proving specifically the wages, hours, and working conditions of employees in support of the proposal were numerous. For example, Mr. Farrell stated:

"* * * [W]hen we see the attempts making to build up industries on a foundation of wages too low to admit of decent standards of family life, and hours of labor too long to admit of sufficient rest and relaxation for even moderate health, we are driven to the knowledge that it is time that a decent human effort should be made to remedy this un-American condition. * * *" 2 Proceedings and Debates, *supra,* at 1328.

Following a discussion of minimum wage regulation in Australia and England, Mr. Farrell addressed similar measures in Wisconsin, Minnesota, and Massachusetts. He quoted at length from the Massachusetts commission report favoring a proposal to fix wages of women and minors.[36]

Mr. Crites responded with argu- ments against a minimum wage. He stated: "If you will consider Proposal No. 122 very carefully, I am quite sure you will plainly see that no such wording should ever go into our organic law. *First, you will note that this proposal is for the sole purpose of limiting the number of hours of labor; second, to establish a minimum wage for the wageworker.* * * *" (Emphasis added.) *Id.* at 1331.[37]

Following Mr. Crites was Mr. Lampson, who expressed his frame of reference regarding the proposal: "* * * I think one of the greatest evils in the industrial situation in this country is what is known as sweatshop work. Women perforce of necessity and of their situation and environment are compelled to labor for wages far below what is necessary to give them a decent living * * *." *Id.* at 1332.

Mr. Lampson was followed by the inimitable Mr. Dwyer, whose perspective is revealed in the statement quoted earlier. After a discussion of

[36] "['] 1. It would promote the general welfare of the state, because it would tend to protect the women workers, and particularly the younger women workers from the economic distress that leads to impaired health and inefficiency.

"['] * * *

"['] 3. It would furnish to the women employes a means of obtaining the best minimum wages that are consistent with the ongoing of the industry without recourse to strikes or industrial disturbances. It would be the best means of insuring industrial peace so far as this class of employes is concerned.

"['] 4. It would tend to prevent exploitation of helpless women, and, so far as they are concerned, to do away with 'sweating' in our industries.

"['] 5. It would diminish the parasite character of some industries and lessen the burden now resting on other employments. * * *[']" *Id.* at 1330.

[37] In his earlier writing in this case the author of today's majority opinion completely discounted Mr. Crites' statements: "Crites was an outspoken critic and vigorous opponent of the amendment, and his characterization of the amendment can hardly be cited as authority for its meaning." *Rocky River, supra,* at 216, 530 N.E. 2d at 18-19 (Douglas, J., dissenting). I, on the other hand, fail to see how the arguments Crites made against the proposal are authority for the suggestion that he did not understand the proposal. Significantly, there was not one comment in Crites' remarks or in any of the discussion suggesting that Crites misunderstood the scope of the proposal. Logically there would be none, as his statement was consistent with every other recorded statement on the proposal's objective.

Incidentally, it should be noted for the record that Mr. Crites voted *for* the passage of Proposal No. 122. 2 Proceedings and Debates, *supra,* at 1955.

steps taken by the English government in this area, he continued: "I have been for many years an advocate of a minimum rate of wages. For that reason I want to cut out the sweatshops, and this minimum wage will cut them out. * * *" *Id.* at 1334.

An exhaustive review of the debates reveals beyond question that the drafters intended to empower the General Assembly to pass laws relating to minimum wages, maximum hours, and the health and safety of employees. Notably, the subject at issue here, *compulsory arbitration,* was discussed in three other proposals but never in connection with Proposal No. 122.[38] With the specific subject areas of Section 34, Article II properly understood, the further provision, "and no other provision of the constitution shall impair or limit this power," becomes equally clear. While no discussion of this language appears in the debate over Proposal No. 122,[39] several statements made *do* reveal the

---

[38] From a review of the index to the constitutional debates it appears that compulsory arbitration in the labor context *was* considered in three separate proposals, *none* of which was contained in Proposal No. 122. First was Proposal No. 71, entitled "Relative to labor," introduced by the majority's Mr. Dwyer and read for the first time on January 22, 1912. 1 Proceedings and Debates, *supra,* at 96. It was referred to the Committee on Labor the next day, *id.* at 102, but was never reported on.

Proposal No. 131, entitled "Relative to strikes, riots, and great ·industrial disturbances," suffered a similar demise. It was introduced by Mr. Miller, of Fairfield, and read for the first time on January 24, 1912, *id.* at 106; was referred to the Committee on Labor the next day, *id.* at 118; was called from the committee April 25, and then immediately recommitted to the committee, 2 Proceedings and Debates, *supra,* at 1428, never to be heard of again.

Finally there was Proposal No. 289, entitled "Relative to establishing courts of arbitration." This proposal was introduced by Mr. Fluke and read for the first time on March 4, 1912, 1 Proceedings and Debates, *supra,* at 564; was referred to the Committee on Labor three days later, *id.* at 639; then was immediately called back and referred to the Committee on Judiciary and Bill of Rights, *id.* at 640. On April 24, 1912, the proposal was reported back with the recommendation that it be indefinitely postponed, which report was agreed to. 2 Proceedings and Debates, *supra,* at 1404.

While the texts of these proposals are not recorded in the debates, and the only reference to their subject matter appears in the index to the proceedings, it must be noted that what is recorded on these three proposals makes no reference to Proposal No. 122. More significant is the fact that in the lengthy discussion and debate over Proposal No. 122 there was not one reference to any of these three proposals or the notion that the subject of compulsory arbitration is intended to be included within the powers granted to the legislature in Proposal No. 122. This, I submit, further supports the view that Section 34, Article II is not all-encompassing and must be construed within its historical context.

[39] This language *was* considered in the discussion of Proposal No. 209, now embodied in Section 37, Article II. This provision sets a maximum number of hours, per day and week, for labor on public works. The opening remarks at the proposal's second reading further reveal the historical context in which this proposal and Proposal No. 122 were offered:

"Mr. TETLOW:  * * *

"This proposal provides for an eight-hour day on public works, and not to exceed forty-eight hours a week on the maintenance and operation of public works, applying to laborers, mechanics, etc. It is quite evident that we desire this proposition to become a constitutional provision to safeguard this right, and to circumvent the decisions rendered by courts of this state. Many of you will remember that in 1900 a state law was passed in this state providing for an eight-hour day on public works, and also an eight-hour day on all contracts and

context in which it was adopted. As more fully stated above, legislation on wages and hours was being struck down in both state and federal courts on freedom of contract and due process grounds. It is towards *those* issues that the proposal was addressed.

In his opening remarks, Mr. Farrell quoted at length from an article by Professor A. N. Holcombe concerning

subcontracts for and in behalf of the state and its political subdivisions. That law was declared unconstitutional by the supreme court of this state in a case arising in Cleveland, The Clements Construction Company v. The City of Cleveland. In that case the supreme court of Ohio decided as follows:

"[']The act of April 16, 1900 (94 Ohio Laws, 357), entitled: "An act to provide for limiting the hours of daily service of laborers, workmen and mechanics employed upon public work, * * *['] is in conflict with sections 1 and 19 of article I of the constitution of Ohio; because it violates and abridges the right of parties to contract * * *.[']

"The action of our supreme court in declaring this law null and void is not in conformity with the decisions rendered on the same subject in other states and by the federal court. We have at the present time an eight-hour law in Arizona, Oklahoma, New Mexico, California, Idaho, Wyoming, New York and Massachusetts. All of those states have enacted laws or constitutional provisions for an eight-hour law on all public works and contracts and subcontracts for such public works. A case arising in Kansas, where the subcontractor was not a resident of that state, allowed a case like the one we had in Ohio, the Clements Construction Company vs. The City of Cleveland, to go to the federal court, and the federal court held that the state had a right, under its police power, to regulate the hours of labor of workmen employed upon public works.

"* * *

"It seems to me that we as a state certainly have a right to establish the hours of labor for men employed by the state and for the state. Certainly we have a right, as held by the federal court, and I do not see any reason why we as a state cannot incorporate this provision into our constitution, to protect this fundamental principle, which we as a people surely have a legal right and a lawful right to do." 2 Proceedings and Debates, *supra*, at 1339.

It can scarcely be doubted that Proposal No. 209 was offered solely in response to *Cleveland* v. *Clements Bros. Constr. Co.* (1902), 67 Ohio St. 197, 65 N.E. 885, and like cases invalidating maximum hour legislation on freedom of contract grounds. Since the proposal dealt with setting maximum hours of labor, several delegates logically suggested that this subject was already covered by Proposal No. 122, agreed to the night before. 2 Proceedings and Debates, *supra,* at 1340-1341. (There were also suggestions of combining the two proposals. *Id.* at 1342-1344.) However, the discussion centered on whether the Constitution itself should set the eight-hour day or simply authorize the legislature to do so. Mr. Tetlow feared that the legislature would not act, but the others found this fear groundless since the legislature had so acted just a few years earlier. *Id.* at 1341. A question arose as to the constitutionality of any such Act by the legislature, and it was strictly within this context that the language of Proposal No. 122 was raised:

"Mr. HALFHILL: Was it stated by you that a few years ago the legislature did pass a law fixing the eight-hour law for labor that was held to be unconstitutional as in conflict with section 1 and section 19 of the bill of rights?

"Mr. TETLOW: Correct.

"Mr. HALFHILL: Now the proposal we adopted last night expressly said at the end of it that no other provision in the constitution should impair or limit this power (referring to the power of the forepart of that proposal). Why haven't you got the best grant of power there can be secured under a constitutional provision, and why is this necessary?

"Mr. TETLOW: The question is this — we have a question here now. It is a question of constitutional provision, and the

the constitutionality of minimum wage legislation. Even a cursory review of this passage reveals the fact that due process and freedom of contract were the obstacles sought to be overcome.[40]

Mr. Dwyer further addressed the contract issue:

"Perhaps some will say that the subject of employment is a matter of contract between employer and employe with which the government has nothing to do. This is not so. * * *

"On this question of private contract let me call attention to a step taken by the English government in reference to Irish landlords some twenty-five years ago. Up to that time the tenant class in Ireland were entirely at the mercy of the landlords. * * * *The conditions became intolerable, but there it was a question of private contract. * * **" (Emphasis added.) 2 Proceedings and Debates, supra,* at 1333.

Following the discussion of the proposal's applicability to farm and domestic labor came this most revealing colloquy:

"Mr. HOSKINS: *I wish to ask: Did your committee in its discussion find or conclude that there was anything in the constitution that would forbid the doing of everything provided for in this proposal?*

"Mr. DWYER: *We were of the opinion that possibly the power is now in the legislature to do that, but we wanted to have the power expressly conferred * * *.*

"Mr. LAMPSON: *Did you investigate the question as to whether that provision in the constitution relating to the passage of laws violating the obligation of contract has any bearing on this proposal?*

"Mr. DWYER: *The courts have been deciding cases. Take that bakeshop case [Lochner, supra] in New York. The supreme court there decided it was a question of private contract about the hours of labor. Our courts are becoming more progressive. They are catching the spirit of the time and they are changing very much to be in accord with public sentiment, and we should enable them to do that and we should put a clause in the constitution that will give the courts an opportunity to more liberally construe these matters than they have done in the past. * * **" (Emphasis added.) *Id.* at 1335.

Mr. Dwyer's reference to *Lochner* v. *New York* is most significant, for it reveals the overall controversy giving rise to Proposal No. 122 — wage and hour legislation versus freedom of contract.[41] The fundamental error em-

---

question before this Convention at this time is the recognition of the right to an eight-hour day for public work. So, I say, why leave the question with the general assembly, which may never pass the law. "* * *

"Mr. HARRIS: * * * The resolution last evening absolutely gives you, as you well know, the same constitutional right as is here embodied in Proposal No. 209. Therefore the supreme court could not possibly declare a law passed under it void — assuming that the proposal of Mr. Farrell, which we passed yesterday, is adopted by the people — the supreme court could not possibly set aside on the ground of un-

constitutionality any measure along these lines, limiting the hours of labor, adopted by the legislature. * * *" *Id.* at 1341-1342.

[40] See Professor Holcombe's analysis, quoted at length by Mr. Farrell, in 2 Proceedings and Debates, *supra,* at 1331.

[41] Moreover, Proposal Nos. 122 and 209 were not the only measures aimed at overcoming judicial decisions striking down legislation on freedom of contract principles. Consider also Proposal No. 166, entitled "Relative to liens," what is now Section 33, Article II. In 1894 the General Assembly enacted a statute which gave a

braced in today's majority opinion lies in its failure to place the language of Section 34, Article II within its historical context.

---

lien on property to subcontractors, laborers, and materialmen even in absence of a contract between the property owner and these persons. See 91 Ohio Laws 135. Similar legislation had been upheld in other states. See, *e.g., Henry & Coatsworth Co.* v. *Evans* (1889), 97 Mo. 47, 10 S.W. 868; *Mallory* v. *La Crosse Abattoir Co.* (1891), 80 Wis. 170, 49 N.W. 1071. Nevertheless, this court in *Palmer & Crawford* v. *Tingle* (1896), 55 Ohio St. 423, 45 N.E. 313, invalidated this law on grounds that it infringed upon the owner's and contractor's liberty of contract. Interestingly, even the United States Supreme Court indicated that it did not believe the Ohio statute violated either the Ohio or the federal Constitution. See *Great Southern Fire Proof Hotel Co.* v. *Jones* (1904), 193 U.S. 532.

Solely in response to *Palmer & Crawford,* Proposal No. 166 was introduced at the 1912 Constitutional Convention:

"Mr. ROCKEL: I think we are wasting a great deal of time discussing the question of the policy of the law. That is entirely in the hands of the legislature. Almost all the states of this Union have passed just such laws as this would authorize our legislature to pass. They have made it different in its application. In some states they have required the contractor to file a statement with the owner of the property as to all material men and all subcontractors and matters of that character. In other states they provide different details. *It would be entirely unnecessary to have this amendment at all in the present constitution were it not for the peculiar view that our supreme court took of our present constitution. That is all there is to it. We might have all these details of what is in the laws of various other states carried out under the present constitution but for the decision of the supreme court of Ohio which prevents it. And I think that if that question comes before our supreme court they will reverse that decision, but it stands now as a bulwark in opposition to everybody."* (Em-

## B

A review of the cases construing Section 34, Article II provides further proof that the provision is limited in phasis added.) 2 Proceedings and Debates, *supra,* at 1416.

The genesis of our constitutional provision on workers' compensation is similar. Proposal No. 24, entitled "Relative to requiring the general assembly to pass laws relative to compensation of employes," was passed by the constitutional convention (2 Proceedings and Debates, *supra,* at 1952) and subsequently adopted by the people as Section 35, Article II. In 1911 the General Assembly had adopted a State Insurance Fund workers' compensation system. The constitutionality of this legislation was upheld over, *inter alia,* freedom of contract, by four sitting members of this court in *State, ex rel. Yaple,* v. *Creamer* (1912), 85 Ohio St. 349, 97 N.E. 602. At the time this decision was rendered Proposal No. 24 was pending before the Committee on Labor, having been referred to that committee on January 22, 1912. 1 Proceedings and Debates, *supra,* at 96.

The proposal came on for its second reading on April 23, 1912, approximately two months after the *Yaple* decision. 2 Proceedings and Debates, *supra,* at 1346. The reference to *Yaple* at that point is instructive:

"Mr. CORDES: Mr. President and Gentlemen of the Convention: Proposal No. 24 undertakes to write into the constitution of Ohio a constitutional provision making *secure* the workmen's compensation law passed by the last legislature, and declared constitutional by the Ohio supreme court by a vote of 4 to 2. Labor asks that this proposal be adopted, because we believe that by writing it into the constitution it will make it possible to continue this beneficial measure *without any further fear of a constitutional question being raised again on this matter.* * * *

"* * *

"I believe that it is but just and humane in this age of progress and rapidity in industrial affairs that the industrial workers should be protected against accidents and

scope. One example directly on point is *Craig* v. *Youngstown* (1954), 162 Ohio St. 215, 55 O.O. 110, 123 N.E. 2d 19. The city of Youngstown, a charter city, authorized its council to fix the salary of all officers and employees of the city. The council adopted civil service regulations, and plaintiff, a classified civil service employee of the city, was paid pursuant to those regulations. Plaintiff brought an action against the city for underpayment, alleging that because he was working on the construction of public improvements his compensation should have been equal to the prevailing wage for the type of work he performed. Thus, the question specifically presented was whether a charter city is amenable to the Prevailing Wage Law (then G.C. 17-3 *et seq.*) with respect to compensation of its civil service employees. In finding for the city, this court unanimously rejected the plaintiff's attempt to rely on Section 34, Article II:

"The appellant urges that the Prevailing Wage Law was enacted by the General Assembly pursuant to Section 34, Article II of the Ohio Constitution, which provides:

" 'Laws may be passed * * *'

"It is argued that application of the Prevailing Wage Law as to employees of municipalities can not be prevented through reliance upon the home-rule powers of a charter city, which powers are granted in Article XVIII of the Ohio Constitution. It is the view of this court that the Prevail-

ing Wage Law does not establish '*a minimum wage'* in the sense that those words are used in Section 34, Article II of the Constitution. In that connection it is to be noted that the General Assembly has enacted other statutes comprised in Sections 154-45*d* to 154-45*t*, General Code, which sections appear under the heading, 'Minimum Fair Wage Standards,' and which are commonly known as *the Minimum Wage Act.* The corresponding sections in the Revised Code are 4111.01 *et seq.* There is no issue in the instant case with respect to the Minimum Wage Act and no construction of it is required or undertaken herein. It is only pertinent to observe that the subject of minimum wage was covered by the General Assembly by the enactment of statutes entirely separate from those comprising the Prevailing Wage Law." (Emphasis *sic.*) *Id.* at 220-221, 55 O.O. at 112-113, 123 N.E. 2d at 22.

The applicability of the Prevailing Wage Law to municipalities was, of course, again brought before this court in *State, ex rel. Evans,* v. *Moore* (1982), 69 Ohio St. 2d 88, 23 O.O. 3d 145, 431 N.E. 2d 311. A majority of the court there held that the Prevailing Wage Law was a law of genuine statewide concern and preempted any conflicting local ordinance. However, neither the syllabus law, in which four justices concurred, nor the lead opinion, in which three justices concurred, relied on or *even mentioned* Section 34, Article II. Only Justice William B. Brown, in his

---

occupational diseases, and that *more attention should be given to human rights rather than, as we have done in the past, devote all our attention to property rights [e.g.,* freedom of contract]. * * *" (Emphasis added.) *Id.* at 1346-1347.

The common theme running through the debates on all these provisions is obvious — the framers wanted to improve

wages, hours, and health and safety of employees. Employer and employee freedom of contract, as interpreted in *Lochner, Clements Bros., Palmer & Crawford, supra,* and countless other cases, stood as the principal impediment to this effort. Accordingly, provisions were placed in our organic law to overcome this impediment.

brief concurring opinion, expressed the view that the authority to promulgate the prevailing wage statutes could derive from Section 34, Article II.

Only in the following contexts has Section 34, Article II been relied upon to any extent by this court: (1) laws establishing the authority of the Public Utilities Commission to enforce orders for the protection, welfare and safety of employees, *Akron & Barberton Belt Rd. Co.* v. *Pub. Util. Comm.* (1947), 148 Ohio St. 282, 35 O.O. 288, 74 N.E. 2d 256[42]; (2) workers' compensation laws and employer responsibilities thereunder, *Indus. Comm.* v. *Warnke* (1936), 131 Ohio St. 140, 5 O.O. 505, 2 N.E. 2d 248; *Ohio Automatic Sprinkler Co.* v. *Fender* (1923), 108 Ohio St. 149, 141 N.E. 269[43]; (3) minimum wage laws, *Strain* v. *Southerton* (1947), 148 Ohio St. 153, 35 O.O. 167, 74 N.E. 2d 69; (4) Sunday closing laws, *State* v. *Kidd* (1958), 167 Ohio St. 521, 5 O.O. 2d 202, 150 N.E. 2d 413[44]; (5) laws regulating the hours of city fire department employees, *State, ex rel. Strain,* v. *Houston* (1941), 138 Ohio St. 203, 20 O.O. 265, 34 N.E. 2d 219; (6) "frequenter" laws, requiring employers to furnish a place of employment safe for employees and frequenters, *Comerford* v. *Jones & Laughlin Steel Corp.* (1959),' 170 Ohio St. 117, 10 O.O. 2d 11, 162 N.E. 2d 861. Notably, *every one* of these cases deals with either the minimum wage, hours of labor, or safety conditions.[45]

---

[42] See, also, *Cincinnati, New Orleans & Texas Pacific Ry. Co.* v. *Pub. Util. Comm.* (1972), 31 Ohio St. 2d 81, 85-89, 60 O.O. 2d 52, 54-56, 285 N.E. 2d 371, 373-375 (L. Brown, J., dissenting).

[43] See, also, dissenting opinions of Justice Wanamaker in *Patten* v. *Aluminum Castings Co.* (1922), 105 Ohio St. 1, 49-93, 136 N.E. 426, 448-453; *Toledo Cooker Co.* v. *Sniegowski* (1922), 105 Ohio St. 161, 161-180, 136 N.E. 904, 904-910; and *American Woodenware Mfg. Co.* v. *Schorling* (1917), 96 Ohio St. 305, 332-359, 117 N.E. 366, 374-380. (These cases were all overruled in *Ohio Automatic Sprinkler Co.* v. *Fender* (1923), 108 Ohio St. 149, 141 N.E. 269, paragraph three of the syllabus.) Justice Wanamaker also made reference to Section 34, Article II, and *Patten, supra,* in a completely unrelated context in his dissenting opinion in *Local Tel. Co.* v. *Cranberry Mut. Tel. Co.* (1921), 102 Ohio St. 524, 568, 133 N.E. 527, 539.

[44] See, also, *State* v. *Bondi* (1957), 166 Ohio St. 448, 2 O.O. 2d 442, 143 N.E. 2d 579 (appeal dismissed for lack of a debatable constitutional question).

[45] Section 34, Article II has been cited, though not relied upon, by this court in related contexts. For example, in *Wilson* v. *Zanesville* (1935), 130 Ohio St. 286, 4 O.O. 311, 199 N.E. 187, this court upheld a local ordinance regulating the hours of labor in barber shops. Section 34 was mentioned only with reference to the term "laws" as used therein, the court noting that the term does *not* include municipal ordinances. For the same proposition Section 34 was cited in *Cincinnati* v. *Correll* (1943), 141 Ohio St. 535, 26 O.O. 116, 49 N.E. 2d 412, which overruled *Wilson* and struck down an ordinance similar to the one upheld in *Wilson.*

In *Fuldauer* v. *Cleveland* (1972), 32 Ohio St. 2d 114, 61 O.O. 2d 374, 290 N.E. 2d 546, Section 34 was held inapplicable to a charter provision establishing a formula for computing the compensation of municipal safety forces. Noting that Section 34 is not self-executing, this court upheld the charter provision.

In *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Kinney* (1916), 95 Ohio St. 64, 115 N.E. 505, this court held that a contract between an employer and his employee which released the employer from liability for any injury incurred by the employee as a result of the employment is against public policy and unenforceable. Section 34 was cited as evidence of the "broad humanitarian policy of the state to

The sole exception is found in *Pension Fund, supra,* which discussed Section 34, Article II as authority for the state's power to establish a statewide pension system. *Pension Fund,* while standing alone in a myriad of cases to the contrary, does lend support to the majority's position. The discussion of *Pension Fund* involves a truly remarkable form of hermeneutical reasoning. This form of opinion writing generally requires a text to be interpreted, explained or expounded on. *Pension Fund* contains no constitutional history, ignores the ramifications of its language, and like the majority reaches its conclusion absent rules, facts or rationale. This court, as I have, has erred on occasion. That was the case in *Pension Fund.*

As to more recent jurisprudence, any attempt by the majority to rely on *State, ex rel. Dayton Fraternal Order of Police Lodge No. 44,* v. *State Emp. Relations Bd.* (1986), 22 Ohio St. 3d 1, 22 OBR 1, 488 N.E. 2d 181, and *Kettering* v. *State Emp. Relations Bd.* (1986), 26 Ohio St. 3d 50, 26 OBR 42, 496 N.E. 2d 983, in this context is without merit. It is simply not true that "[t]hese cases long ago settled the home-rule amendment argument pitting Sections 3 and 7, Article XVIII versus Section 34, Article II of the Ohio Constitution." In fact, Section 34 is *not even mentioned*

in the majority opinion in either of these cases. The majority herein implicitly recognizes this fact by citing neither *Dayton F.O.P.* nor *Kettering* in Section IV C of its opinion. However, I am compelled to point out what I believe is a misstatement of these cases in Section II A.

The holding in *Dayton F.O.P.* is at war with today's holding, and I submit that the majority's analysis herein has overruled paragraph one and half of paragraph two of the syllabus of *Dayton F.O.P.* In paragraph one we held that the second sentence of R.C. 4117.01(F)(2), the so-called Dayton Amendment, violated Section 26, Article II because it did not have a uniform operation throughout the state. In paragraph two we held that this sentence also violated state and federal equal protection guarantees.

The majority today holds that the Ohio Public Employees' Collective Bargaining Act was enacted pursuant to Section 34, Article II, and that therefore *every* section of the Act necessarily prevails over *all* provisions of the Ohio Constitution. Under this analysis we could not possibly hold that anything in the Act is void on state constitutional grounds. However, that is precisely what this court did in the syllabus of *Dayton F.O.P.*[46] If R.C. 4117.14(I) is beyond the reach of this

---

safeguard the life, limb, health and safety of its people employed in the industrial world * * *." *Id.* at 70, 115 N.E. at 507.

In the following cases Section 34 was mentioned with little discussion or no discussion at all: *Cleveland, ex rel. Neelon,* v. *Locher* (1971), 25 Ohio St. 2d 49, 54 O.O. 2d 189, 266 N.E. 2d 831; *Malloy* v. *Westlake* (1977), 52 Ohio St. 2d 103, 6 O.O. 3d 329, 370 N.E. 2d 457; *Phung* v. *Waste Management, Inc.* (1986), 23 Ohio St. 3d 100, 23 OBR 260, 491 N.E. 2d 1114; *State Personnel Bd. of Review* v. *Bay Village Civil Service Comm.* (1986), 28 Ohio St. 3d 214, 28 OBR 298, 503 N.E. 2d 518.

Having thoroughly reviewed every decision of this court that relied on, discussed, or even mentioned Section 34, Article II, I reach the unmistakable conclusion that this constitutional provision has never been given the incredible breadth ascribed to it by the majority today.

[46] The only vestige of our ruling in *Dayton F.O.P.* is that the second sentence of R.C. 4117.01(F)(2) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Id.* at paragraph two of the syllabus.

court, so too must be the second sentence of R.C. 4117.01(F)(2).[47]

In this same vein, there is no way to square paragraph two of today's syllabus with paragraph one. Paragraph two, when considered in conjunction with the discussion pertaining thereto, holds that R.C. Chapter 4117, having been enacted pursuant to Section 34, Article II, prevails over *every* other provision of the Ohio Constitution. Why, pray tell, does the majority hold in paragraph one of the syllabus that R.C. 4117.14(I) in particular is not an unlawful delegation of legislative authority? Is not the proscription against such delegation also found in the Ohio Constitution, in those provisions creating our state government's heretofore balanced separation of powers? There is no need for today's analysis of this issue, as legislation enacted for the "general welfare" of employees may now delegate any amount of legislative authority, as well as executive and judicial authority, with complete impunity. Thus I submit that paragraph one of the syllabus is *obiter dictum* at best, and at worst undermines the majority's view of Section 34, Article II, for it implicitly recognizes that exceptions thereto may be entertained.[48]

This same inconsistency is evident in this court's very recent decision in *Central Ohio Transit Auth.* v. *Transport Workers Union of America, Local 208, supra.* In paragraph one of the syllabus of that case this court held, "R.C. 4117.16(A) does not violate Constitution, or constitute the delegation of legislative power in contravention of Section 26, Article II of the same instrument?" *Id.* at 159, 35 O.O. at 170, 74 N.E. 2d at 72. The first question was disposed of in a single sentence: "The Ohio Minimum Wage Act is a welfare measure passed by the General Assembly pursuant to the authority conferred by Section 34, Article II of the Constitution." *Id.* at 160, 35 O.O. at 170-171, 74 N.E. 2d at 73. However, it took several pages of analysis to reach the conclusion that the Act "does not represent delegation of legislative power * * *." *Id.* at 162, 35 O.O. at 171, 74 N.E. 2d at 73.

It seems to me that if the court in *Strain* v. *Southerton* had held the same view of Section 34, Article II as is held by today's majority, the answering of the first question posed therein should have ended the inquiry. Nothing in the Minimum Wage Act could possibly violate *any* provision of the Ohio Constitution. However, as I read *Strain* v. *Southerton,* and paragraph one of today's syllabus, I see clear implication that even legislation passed under Section 34, Article II, might in some situation constitute an unlawful delegation of legislative authority in violation of Section 26, Article II. With this implication today's majority analysis of Section 34, Article II is completely irreconcilable.

---

[47] I suppose it could be hypothesized that the second sentence of R.C. 4117.01(F)(2) was not necessarily "favorable" to all employees and, thus, that that particular sentence was not enacted pursuant to Section 34, Article II. However, this would be contrary to the majority's premise that all of the Public Employees' Collective Bargaining Act was enacted pursuant to Section 34, Article II. Moreover, such a piecemeal approach to the constitutionality of this Act would be ridiculous, as it would require this court to evaluate each section of the Act on the basis of whether or not it "favored" the employee. Each section we find "favorable" to employees would be beyond constitutional question, while each section not "favorable" could be stricken on state constitutional grounds. Aside from the difficulty of all this, such an analysis would completely eliminate any balance between employer and employee interests sought to be achieved in the Act, as well as raise obvious equal protection concerns.

[48] Moreover, this is not the first time this court has engaged in this very same analysis. Consider *Strain* v. *Southerton, supra,* which asked the following questions in evaluating the Minimum Wage Act: "* * * [D]oes such act exceed the contemplation of Section 34, Article II of the

the doctrine of separation of powers." If R.C. Chapter 4117 was enacted under an all-powerful Section 34, Article II, as three members of the court therein held, why need we ask if anything in the Act violates the separation of powers doctrine? The question has already been answered — nothing within the Act ever could. Thus, in paragraph one of the syllabus of *Central Ohio Transit Auth.,* as in paragraph one of today's syllabus, I find *obiter dictum* which in my view contradicts the majority's analysis of Section 34, Article II.

## II

In Part IV B the majority holds that because R.C. Chapter 4117 is a "general law," it takes precedence over any conflicting local interests. This court did hold in *Dayton F.O.P., supra,* at paragraph one of the syllabus, that, "[t]he collective bargaining law of the state of Ohio is a law of a general nature. * * *" However, in concluding, then, that the collective bargaining law necessarily prevails over all powers of local self-government, the majority misconstrues Sections 3 and 7, Article XVIII, and completely disregards a number of decisions of this court contrary to that conclusion.

In *State, ex rel. Canada,* v. *Phillips* (1958), 168 Ohio St. 191, 5 O.O. 2d 481,

151 N.E. 2d 722, paragraph four of the syllabus, this court held:

"The words, 'as are not in conflict with general laws' found in Section 3 of Article XVIII of the Constitution, modify the words 'local police, sanitary and other similar regulations' but do not modify the words 'powers of local self-government.' "

This holding has been reaffirmed by this court in numerous cases since 1958. See *State, ex rel. Petit,* v. *Wagner* (1960), 170 Ohio St. 297, 301, 10 O.O. 2d 344, 346, 164 N.E. 2d 574, 576-577; *Beacon Journal Publishing Co.* v. *Akron* (1965), 3 Ohio St. 2d 191, 195, 32 O.O. 2d 183, 185, 209 N.E. 2d 399, 402.[49] Moreover, paragraph four of the *Canada* syllabus is consistent with many cases that preceded it. See, *e.g., Benjamin* v. *Columbus* (1957), 167 Ohio St. 103, 108, 4 O.O. 2d 113, 116, 146 N.E. 2d 854, 859; *State, ex rel. Bindas,* v. *Andrish* (1956), 165 Ohio St. 441, 60 O.O. 92, 136 N.E. 2d 43, paragraph one of the syllabus.[50]

I object to both form and substance of the majority's covert rejection of this well-settled principle. As to the form, it seems to me that a brief footnote containing one general quote from a constitutional delegate is a woefully inadequate basis for disposing of over seventy years of established precedent. As to the substance, in re-

---

[49] See, also, *State, ex rel. Mullin,* v. *Mansfield, supra,* at 132, 55 O.O. 2d at 241, 269 N.E. 2d at 604; *State, ex rel. Kohl,* v. *Dunipace* (1978), 56 Ohio St. 2d 120, 121, 10 O.O. 3d 309, 382 N.E. 2d 1358, 1359; *Dies Electric Co.* v. *Akron* (1980), 62 Ohio St. 2d 322, 325, 16 O.O. 3d 365, 367, 405 N.E. 2d 1026, 1028; *Novak* v. *Perk* (1980), 64 Ohio St. 2d 43, 45-46, 18 O.O. 3d 251, 252, 413 N.E. 2d 784, 786; *State Personnel Bd. of Review* v. *Bay Village Civil Service Comm.* (1986), 28 Ohio St. 3d 214, 217, 28 OBR 298, 302, 503 N.E. 2d 518, 521; *Fen-*

ton v. *Enaharo* (1987), 31 Ohio St. 3d 69, 70-71, 31 OBR 183, 184, 509 N.E. 2d 67, 68-69; *Ohio Assn. of Pub. School Emp., Chapter No. 471* v. *Twinsburg* (1988), 36 Ohio St. 3d 180, 182, 522 N.E. 2d 532, 534.

[50] See, also, *State, ex rel. Lynch,* v. *Cleveland* (1956), 164 Ohio St. 437, 52 O.O. 287, 132 N.E. 2d 118, paragraph one of the syllabus; *State, ex rel. Arey,* v. *Sherrill* (1944), 142 Ohio St. 574, 578, 27 O.O. 505, 507, 53 N.E. 2d 501, 504; *Fitzgerald* v. *Cleveland* (1913), 88 Ohio St. 338, 359-360, 103 N.E. 512, 517-518.

jecting paragraph four of the *Canada* syllabus, the majority implies that this court has never before considered the constitutional debates on this issue. This is not an accurate assumption.

In *State, ex rel. Petit,* v. *Wagner, supra,* this court *did* review in some depth the constitutional proceedings regarding the home-rule amendment on precisely this question:

"Ohio municipalities which have adopted charters have done so under Section 7, Article XVIII of the Constitution, which reads as follows:

" 'Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of Section 3 of this Article, exercise thereunder all powers of local self-government.'

"It will be quickly noted that such section does not contain the limiting last phrase of the home-rule amendment (Section 3, Article XVIII), 'as are not in conflict with general laws.' This omission has occasioned much judicial discussion, and, as has been recognized in such recent cases as *State, ex rel. Lynch,* v. *City of Cleveland,* 164 Ohio St., 437, 132 N.E. (2d), 118, and *State, ex rel. Canada,* v. *Phillips, Dir.,* 168 Ohio St., 191, 151 N.E. (2d), 722, some lack of consistency has existed. As Weygandt, C.J., pointed out in the *Lynch case,* Sections 3 and 7 of Article XVIII 'have been highly and often bitterly controversial even from the time they were first proposed.' The controversy concerns whether the last phrase just quoted ('as are not in conflict with general laws') modifies all that has gone before it in Section 3, or only the portion dealing with the adoption of and enforcement within the municipality's limits of 'local police,

sanitary and other similar regulations.' It is argued that the modifying phrase applies not to this portion alone but to the opening phrase (dealing with 'all powers of local self-government') as well because the framers of the Constitution knowingly refused to separate the phrases designating the two classifications of functions by a comma (2 Ohio Constitutional Convention, Proceedings and Debates [1912], 1860 to 1861). While the insertion of the comma would have been proof positive of an intent to have the modifier apply to the second phrase only, the converse does not necessarily follow, and this court has chosen to read the section as it would have had a comma been inserted after the word, 'self-government.' This is the clear effect of the *Lynch* and *Canada cases, supra.*

"Indeed, any other interpretation of Section 3 would render the adoption of Section 7 senseless, because its grant of authority for municipal charter operation is specifically 'subject to the provisions of Section 3.' If full home-rule authority were intended to have been created by Section 3, the adoption of Section 7 could only be considered as a vain and superfluous act. Such a conclusion would be completely lacking in justification, and was expressly denied in the *Canada case, supra,* paragraph four of the syllabus * * *." *Id.* at 300-301, 10 O.O. 2d at 346, 164 N.E. 2d at 576-577.

It is thus clear that the court in *State, ex rel. Petit,* v. *Wagner, supra,* did find that paragraph four of the syllabus in *Canada* was wholly consistent with the recorded debates on the home-rule amendment. Having fully reviewed these debates I am compelled to agree.[51]

---

[51] The precise question at issue, whether the "as are not in conflict with general laws" language in Section 3, Article XVIII modifies only the police and sanitary powers or also the powers of local self-government, can be resolved by tracing

Again, I must point out the majority's misuse of earlier cases of this court. While the fact that "the collective bargaining law of the state of Ohio is a law of a general nature" may have

been settled in *Dayton F.O.P.,* neither that case nor *Kettering* held that all "general laws" necessarily prevail over "laws of a municipality adopted in the exercise of its powers of local self-

---

Proposal No. 272, "Relative to the government of municipalities," through its many changes.

The original draft of Section 7, Article XVIII provided:

"[']Any city or village may frame and adopt a charter for its own government and may exercise thereunder all powers of local self-government; but all such charters shall be subject to the general law of the state, except in municipal affairs.[']" See 2 Proceedings and Debates, *supra,* at 1446 (statement of Mr. Rockel).

There was evidently some disagreement over the words "municipal affairs," as the use of that term in the California Constitution had caused significant definitional problems for the courts of that state. *Id.* at 1446-1447. The phrase "except in municipal affairs," was dropped and replaced with the phrase "affecting the welfare of the state, as a whole." Thus when it was reported back from committee, Section 7 read:

"[']Any city or village may frame, adopt or amend a charter for its government, and may exercise thereunder all powers of local self-government; but all such charters and powers shall be subject to general laws affecting the welfare of the state, as a whole.[']" *Id.* at 1313.

At this stage of the proceedings Section 3 provided:

"[']Municipalities shall have power to enact and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws, affecting the welfare of the state, as a whole, and no such regulation shall by reasons of requirements therein, in addition to those fixed by law, be deemed in conflict therewith unless the general assembly, by general law, affecting the welfare of the state as a whole, shall specifically deny all municipalities the right to act thereon.[']" *Id.*

There followed some discussion of

whether the modifier "affecting the welfare of the state as a whole" added anything to the term "general laws." *Id.* at 1468-1472. An amendment was offered by Mr. Doty to strike the balance of Section 3 after the word "laws," and to strike from Section 7 · the modifier "affecting the welfare of the state, as a whole." *Id.* at 1472. This amendment was subsequently agreed to. *Id.* at 1474.

During the discussion on Mr. Doty's amendment concerns were raised about its effect in light of the prior deletion of the phrase "except in municipal affairs":

"Mr. HARRIS, of Hamilton: I call your attention to original Proposal No. 272 in your proposal book, which came to the committee on Municipalities. In line 32 of the original proposal we have the words, 'except in municipal affairs.' Those four words were almost demanded by your local people and those words are taken from the California constitution and they were cut out of the draft for the reason stated on the floor and the qualifying words that you now want to eliminate were substituted in their place. I suggest to you that if you are going to cut out everything after the words 'general laws' you should add the words 'except in municipal affairs,' or you will be stoned to death when you reach Cleveland. I tell you you are destroying municipal home rule." *Id.* at 1473.

Mr. Doty responded, again raising the concerns expressed earlier regarding that language: "I have no objection to putting in the exception if we can understand what it means or if we have any fair chance of understanding it. * * *" *Id.*

Mr. Doty's amendment was passed, and there followed a discussion of various specific issues relating to the appropriation of property for public improvements and the regulation of public utilities. At this point Mr. Crosser expressed his own opposition to the Doty amendment and offered an additional amendment to Sections

government." As discussed above, such a holding would require the overruling of paragraph four of the *Canada* syllabus and the numerous cases in agreement therewith. Neither *Dayton* F.O.P. nor *Kettering* held to that effect.

*Dayton* F.O.P., of course, did not concern home rule. While *Kettering* did specifically hold that R.C. 4117.01

---

3 and 7: in Section 3, addition after the word "laws" of "but such regulations shall be subject to the general laws of the state, except in municipal affairs"; and in Section 7, addition after the word "laws" of "except in municipal affairs." Mr. Crosser stated:

"It seems to me that if we are to have any home rule whatever we should have some language of that kind in the proposal. * * * Let us give citizens by the initiative and referendum real self-government, and let us also give the municipalities real self-government. * * * Let us strike the shackles of political serfdom from municipalities." *Id.* at 1485.

A substitute to this amendment was then offered by none other than Mr. Knight, described by the majority today as "a chief proponent of the [home-rule] amendment." Mr. Knight's proposal consisted of striking the word "power" from Section 3 and inserting the phrase "authority to exercise all powers of local self government, and." *Id.* He described this substituted proposal as follows:

"That substitute just read undertakes, and I think succeeds, to cover the same thing intended by the amendment of the gentleman from Cuyahoga [Mr. Crosser] and avoids the phrase 'in municipal affairs.' * * *

"The substitute I offer places in section 3 the same phrase that occurs in section 7. It is already in section 7. Section 7 deals with those cities which choose to frame charters for themselves, while section 3 deals with the municipalities which choose to remain under general laws, and this puts both kinds of municipalities upon the same footing, so that those who shall operate under general laws shall have authority to exercise all powers of local self-government, and enact and enforce within their limits such local police, sanitary and other similar regulations as are not in conflict with general laws. The same provision is in section 7, with reference to charters of cities framing their own charters, that any city or village may frame, adopt or amend a charter for its government, and exercise thereunder all powers of local self-government, but all such charters and power shall be subject to general laws. We have here identically the same provision. The language may vary a word or two, but it does not vary at all in sense or substance. *It is my belief that the insertion of these words restores to section 3 a vital feature which was by the last action of this Convention before recess today stricken out; that is, in our effort to get away from the question which I am certain we all want to get away from, a good deal more was stricken out that was helpful to municipal home rule, and more than was intended, and it is with a view of restoring to the proposal that which ought to be there in our judgment, without breaking into anything which anybody can by any possibility term a sleeper.*

"Personally I feel that this goes far enough to give us in the cities of this state an adequate measure of municipal home rule, and that it does not in any way raise any controverted question such as we had the flurry over this morning. I am not attempting to insert anything except what is attempted to be accomplished by the amendment of the gentleman from Cuyahoga [Mr. Crosser], but his amendment does contain language which the courts of California have held to be language of uncertain meaning." (Emphasis added.) *Id.*

There was further discussion of the Crosser and Knight amendments, as well as the issue of liquor control. An amendment was offered to replace all of Section 7 with the following:

"Any city or village may frame and adopt or amend a charter for its government and may subject to the provisions of section 3 of this article exercise all powers of local self-government." *Id.* at 1489.

This amendment was agreed to. As to

(F)(2) does not violate a municipality's power of local self-government, it did so on the basis of the belief that public employee collective bargaining is a matter of statewide concern. *Id.* at 55, 26 OBR at 46-47, 496 N.E. 2d at 987-988. Because in my view a city's power to control its own police command officers must prevail over the "statewide concerns" embodied in the Act, I dissented from the result in *Kettering.* Similarly, no matter is more fundamental to the power of local self-government than the power to determine the compensation of municipal employees, including safety forces. Moreover, I seriously doubt that forcing the city of Rocky River into mandatory arbitration with its safety forces affects the general public of the state as a whole more than it does the inhabitants of that city. Thus, even under the "statewide concern doctrine" I believe that R.C. 4117.14(I) unconstitutionally infringes upon local powers of self-government.

Be that as it may, the majority has

in effect eliminated the statewide concern doctrine from our home-rule jurisprudence by completely obviating the need for such analysis. For by holding that *all* powers of local self-government are limited by "general laws" enacted by the General Assembly, the majority has effectively read the home-rule provisions right out of the Ohio Constitution. What Justice Wilkin recognized in 1913 has now become the law of Ohio in 1989:

"If all powers of municipal self-government must be subject to general laws, then clearly cities do not have home rule; they have only such powers of local self-government as the legislature of the state allows to them, and cities of Ohio will still remain under the domination of the state legislature. * * *" *Fitzgerald* v. *Cleveland* (1913), 88 Ohio St. 338, 380, 103 N.E. 512, 523 (Wilkin, J., concurring).

III

I would readily agree that there

---

the pending amendments of Crosser and Knight, the Knight substitute, described by Knight as having the same effect as the Crosser amendment, was then agreed to. At this point Section 3 had reached its current form, and Section 7 was substantially in its current form (the words "city or village" stood in place of the word "municipality"), and Proposal No. 272 was submitted to and subsequently adopted by the people.

Having traced the evolution of Proposal No. 272, it is clear that the interpretation of Sections 3 and 7, Article XVIII, made in *Canada, supra,* was a correct one. Originally only local "police, sanitary and other similar regulations" were subject to the "general laws." Mr. Crosser offered an amendment, to reinstate the reference to "municipal affairs," in an attempt to make clear that with regard to local self-governance general laws would not control. Mr. Knight's substituted amendment was

stated as intending to have the same effect, and it was this substitute that was subsequently adopted. The reader will note that the comma whose absence after the word "self-government" has generated much of this controversy, see *State, ex rel. Petit,* v. *Wagner, supra, was* included in the adopted Knight amendment, though it appears to have been inadvertently deleted when Proposal No. 272 was passed. 2 Proceedings and Debates, *supra,* at 1485 and 1496. The fact that the comma was not added later does not change the Knight amendment's original intent, as the delegate who proposed inserting the comma conceded that it would not enlarge or curtail the powers provided in Section 3. *Id.* at 1860. Thus, the words inserted by the Knight amendment were *not* intended to be modified by the phrase "as are not in conflict with general laws." This was the precise holding in paragraph four of the *Canada* syllabus, and in numerous cases before and after.

are lessons to be learned from Justice Douglas' lengthy and scholarly history of the doctrine of *stare decisis*. Who can doubt the principle that common-law precedents "provide the benchmark by which other case law is measured"? Moreover, I dare say it is axiomatic that "[w]hen a precedent involves statutory interpretation, such precedent is viewed as more sacrosanct than the common-law precedents." However, I am as yet unable to assess how the majority now views the rule of *stare decisis* in the constitutional context.

I certainly accept the basic premise that *stare decisis* should play a lesser role in constitutional jurisprudence. Indeed, our power (or in the majority's term "right") to reexamine constitutional precedent is necessary due to the fact that "we live in an ever-evolving society that requires innovative thinking and even change to cope with problems of the present and future * * *." However, I believe this principle is plainly misused in the instant case, as the majority's discussion of *stare decisis* presses towards a *single* objective — justifying the overruling of *Rocky River, supra.*

Moreover, while the majority on one hand justifies for itself the decision to completely ignore our six-month-old ruling in *Rocky River, supra,* it then relies without reservation on *Pension Fund, supra,* as if that case completely controls the analysis herein. In light of the non-analysis contained in that case, I submit that the majority has effectively eliminated the doctrine of *stare decisis,* limited though it may be, from constitutional jurisprudence in Ohio.

## IV

Returning to the majority's holding on Section 34, Article II, I must state that I would predict there will come a day when the very folks who may applaud today's result will rue this decision. Consider, for example, cases involving anti-union legislation, such as limiting dollar amounts on union dues or a ban on part-time employment for safety forces, passed, of course, as "employee welfare legislation." Faced with this situation, I suggest that we would observe a charismatic uproar that would make the feast of Pentecost appear as quiet time at a day nursery. While I regret the plain fact that the majority has stripped this state's charter cities of their constitutional power of home rule, I deplore even more the way in which the deed was accomplished.

## V

In conclusion, some might suggest that I should merely repeat my support for the views expressed in the Chief Justice's opinion contained in *Rocky River, supra.* But to do so would avoid my obligation as a judge as outlined in a most eloquent manner in the majority opinion. When this court errs, not knowing or avoiding the law, one must speak out. Our Constitution is our greatest lay commandment. To ignore it, for whatever purpose, is bad business indeed.

Perhaps the result achieved by the majority will be salutary. The concept of mandatory arbitration does have the stamp of approval of the General Assembly. However, the notion that a worthy result will justify any means is entirely foreign to Anglo-American jurisprudence. The majority's facile approach to this matter is beguiling, but that reasoning should not be allowed to mask the mischief accomplished by its methodology.

As stated, the majority would have us believe that *any* legislation reasonably connected to the "general welfare of all employes" may not be

impaired or limited by any other portion of the Constitution. Such legislation would clearly have the *effect* of an amendment thereto. The more my brethren try to explain this concept the less one can understand it. In a word, what we have here is not an exercise in constitutional jurisprudence, and I will have no part of it.

I respectfully dissent.